602 S.E.2d 521

**GENERAL MOTORS CORPORATION,
Appellant Below, Appellee,**

v.

**Hubert J. SMITH, Appellee, and
Complainant Below,
Appellant,**

and

**The West Virginia Human Rights
Commission, Appellee Below,
Appellant.**

**No. 31425.**

Supreme Court of Appeals of
West Virginia.

Submitted Jan. 13, 2004.

Decided June 25, 2004.

Concurring Opinion of Justice
Starcher July 8, 2004.

Ronald S. Rossi, Esq., Susan R. Snowden, Esq., Martin & Seibert, L.C., Martinsburg, for General Motors Corporation.

Robert J. Schiavoni, Esq., David M. Hammer, Esq., Hammer, Ferretti & Schiavoni, Martinsburg, for Hubert J. Smith and the West Virginia Human Rights Commission.

PER CURIAM.

Hubert J. Smith, Appellant, contests the final order of the Circuit Court of Kanawha County ruling that his disability discrimination claim under the State Human Rights Act against General Motors Corporation (hereafter "GM"), Appellee, is preempted by both the federal Labor Management Relations Act and the federal Employee Retirement Income Security Act, and fails to meet the statutory definition of "unlawful discrimination." After careful consideration of the issues raised herein, we reverse.

## I.

### FACTS

While this case involves a dispute over a disability retirement, it is not a case of a plaintiff seeking to prove a disability or win any sort of benefits. This case concerns the efforts of Hubert J. Smith, Appellant, who despite receiving a permanent and total disability retirement from his job for GM, sought to give up his retirement benefits and go back to work.

Early in 1971, Mr. Smith began working for GM at its parts storage warehouse in Martinsburg, West Virginia, where he served as chairman of the workplace Civil Rights Committee. For much of his time at GM, Mr. Smith was a "Power Sweeper Operator," which essentially means that he drove a machine up and down the warehouse aisles cleaning the floor.[1]

During his time working for GM, Mr. Smith took an additional job working for the local Veterans' Administration office to help support his large family, usually working 7 to 3 for the VA, and then working another full shift at the GM plant. He first injured his back during his service in the Unites States Marine Corps, and re-injured it several times during the course of his employment. In 1985, he fell down a flight of stairs and suffered a lower back injury that ultimately resulted in three back surgeries. As a result of his condition, Mr. Smith either took, or was strongly encouraged by GM to take, a total and permanent disability retirement.[2]

As established in the union contract, or collective bargaining agreement, between the United Auto Workers Union, of which Smith was a member, and GM, a retired employee may return to work under certain conditions:

(f) Retirement as follows:

(1) An employee who retires, or who is retired under the terms of the Pension Plan, shall cease to be an employee and shall have seniority canceled.

(2) An employee who has been retired on a permanent and total disability pension and who hereby has broken seniority in accordance with subsection (1) above, but, who recovers and has pension payments discontinued, shall have seniority reinstated as though the employee had been on a

---

1. The record reveals that the "power sweeper" rides on air cushioned tires and uses mechanical brushes to collect debris from the plant floor; it then uses another set of brushes to scrub the floor with a cleaning solution, and then collects the dirty solution into a tank. An operator rides the machine for most of a shift, and spends about an hour preparing the machine for the next shift. If the machine requires any repairs, those are performed by another department in the plant.

2. Mr. Smith argues that he was forced into retirement by GM, and points to comments made by GM's medical director as evidence of a discriminatory animus.

sick leave of absence during the period of disability retirement, provided however, if the period of disability retirement was for a period longer than the seniority the employee had at the date of retirement, the employee shall, upon the discontinuance of the disability pension, be given seniority equal to the amount of seniority the employee had at the date of such retirement.

When a retiree meets the two criteria to return to work set forth in paragraph 64(f)(2) above, the parties should proceed as though the retirement had not occurred and the employee may return to the job held before retirement.

Given permission by his doctor to return to work, and feeling that his back had improved, Mr. Smith decided that he wanted to return to gainful employment at GM. He began the attempt to get his old job back on May 26, 1995, by submitting an authorization to return to work supplied by his treating physician. Over the next two years, his efforts to give up his retirement and return to work were impeded by a variety of bureaucratic hurdles erected by GM. GM did not even schedule a physical examination of Mr. Smith until June 11, 1997, some two years after he contacted the company about returning to work. Finally on July 22, a GM manager informed Mr. Smith that, according to the GM doctor, he was still too disabled to perform his old job, and would not be rehired by GM.

Responding to GM's refusal to re-employ him, Mr. Smith filed a complaint on July 24, 1998 with the West Virginia Human Rights Commission; his complaint alleged that he was able, with or without reasonable accommodation, to perform the essential function of a Power Sweeper Operator, but that GM failed to reinstate him because of his disability.

Over the course of a two day hearing, Mr. Smith presented evidence that several employees of GM had lied to Mr. Smith about his rights, had misstated his job duties, had overstated his disability, and had committed other impermissible acts to ensure that he would not return to work. Eventually, on May 1, 2001, the Human Rights Commission's administrative law judge ruled in Smith's favor, and the Commission later affirmed this ruling. GM appealed this decision, and the Circuit Court of Kanawha County reversed, finding that Mr. Smith's claim does not meet the statutory definition of "unlawful discrimination," and the state law claim is preempted by both the federal Labor Management Relations Act (sometimes referred to as the "LMRA") and the federal Employee Retirement Income Security Act (sometimes referred to as "ERISA"). Mr. Smith now appeals this order.

## II.

### STANDARD OF REVIEW

■ Circuit court decisions reversing an administrative agency receive a two-part review by this Court. "In cases where the circuit court has amended the result before the administrative agency, this Court reviews the final order of the circuit court and the ultimate disposition by it of an administrative law case under an abuse of discretion standard and reviews questions of law *de novo.*" Syl. pt. 2, *Muscatell v. Cline*, 196 W.Va. 588, 474 S.E.2d 518 (1996). The question before us, which is whether Smith's state disability discrimination claim is preempted by federal law, is a question of law that we review *de novo.* We are also mindful that: "West Virginia Human Rights Commission's findings of fact should be sustained by reviewing courts if they are supported by substantial evidence or are unchallenged by the parties." Syl. pt. 1, *West Virginia Human Rights Com'n v. United Transp. Union, Local No. 655*, 167 W.Va. 282, 280 S.E.2d 653 (1981); *accord* syl. pt. 1, *Fairmont Specialty Services v. West Virginia Human Rights Com'n*, 206 W.Va. 86, 522 S.E.2d 180 (1999); syl. pt. 2, *Tom's Convenient Food Mart, Inc. v. West Virginia Human Rights Com'n*, 206 W.Va. 611, 527 S.E.2d 155 (1999) (*per curiam*).

## III.

### DISCUSSION

#### A. Preemption

■ Knowing that Federal preemption is the greatest hurdle he must overcome, Mr.

Smith first argues that neither federal pension law,[3] nor federal labor contract law,[4] preempts his claim. The essence of his argument is that, although Mr. Smith's initial right to seek re-employment with GM is a creature of his union contract, GM violated several aspects of our State employment law in the way it handled his request to come back to work.

 Several decisions of this Court explain that federal preemption[5] of state law is generally disfavored, and is more often the exception than the rule. The Court has also noted that state courts have jurisdiction to determine whether or not federal law should preempt a claim filed in a state court. We have explained that "[i]t is clear that state courts, including our own, have the authority to decide whether a state provision is indeed preempted by federal law." *In re: West Virginia Asbestos Litigation*, 215 W.Va. 39, 42, 592 S.E.2d 818, 821 (2003). Or, more succinctly: "West Virginia state courts have subject matter jurisdiction over federal preemption defenses." Syl. pt. 3, *State ex rel. Orlofske v. City of Wheeling*, 212 W.Va. 538, 575 S.E.2d 148 (2002).[6]

 Our law has a general bias against preemption: "Moreover, both this Court and the U.S. Supreme Court have explained that

federal preemption of state court authority is generally the exception, and not the rule." *In re: West Virginia Asbestos Litigation*, 215 W.Va. at 42, 592 S.E.2d at 821. And preemption should not be considered lightly: "Despite the existence of this doctrine, however, preemption is disfavored in the absence of convincing evidence warranting its application [.]" *Hartley Marine Corp. v. Mierke*, 196 W.Va. 669, 673, 474 S.E.2d 599, 603 (1996), *cert denied sub nom. Hartley Marine Corp. v. Paige*, 519 U.S. 1108, 117 S.Ct. 942, 136 L.Ed.2d 832 (1997). Finally we have noted, "[a]s a result, there is a strong presumption that Congress does not intend to preempt areas of traditional state regulation." *Chevy Chase Bank v. McCamant*, 204 W.Va. 295, 300, 512 S.E.2d 217, 222 (1998) (citing, *FMC Corp. v. Holliday*, 498 U.S. 52, 111 S.Ct. 403, 112 L.Ed.2d 356 (1990)).[7]

Bearing in mind these general principles, we turn to the lower court's finding that ERISA preempts Mr. Smith's claim. This Court has noted:

> A party seeking preemption under the jurisdictional provision of the Employee Retirement Income Security Act, 29 U.S.C. § 1144(a) (1994), must first overcome the starting presumption that Congress does not intend to supplant state law. State law

---

3. By pension law we mean the jurisdictional provisions of the Employee Retirement Income Security Act, codified at 29 U.S.C. § 1144 (1998), which we sometimes refer to as ERISA.

4. By labor contract law we mean the jurisdictional provisions of the Labor Management Relations Act, codified at 29 U.S.C. § 185 (1947), which we sometimes refer to as the LMRA.

5. As this Court has explained previously, the Supremacy Clause of the United States Constitution provides the basis for any preemption claim: "The Supremacy Clause of the United States Constitution, Article VI, Clause 2, invalidates state laws that interfere with or are contrary to federal law." Syl. pt. 1, *Cutright v. Metropolitan Life Ins. Co.*, 201 W.Va. 50, 491 S.E.2d 308 (1997).

6. The United States Supreme Court has stated: "[W]hen a state proceeding presents a federal issue, even a pre-emption issue, the proper course is to seek resolution of that issue by the state court." *Chick Kam Choo v. Exxon Corp.*, 486 U.S. 140, 149–50, 108 S.Ct. 1684, 1691, 100 L.Ed.2d 127, 138 (1988).

7. As we noted in a recent case:

> [O]ur view is in agreement with that of the U.S. Supreme Court on this issue:
> "[B]ecause the States are independent sovereigns in our federal system, we have long presumed that Congress does not cavalierly preempt state-law causes of action. In all preemption cases, and particularly in those in which Congress has 'legislated ... in a field which the States have traditionally occupied,' *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947), we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress."
> *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485, 116 S.Ct. 2240, 2250, 135 L.Ed.2d 700, 715 (1996) (internal quotations and citation omitted); *accord, City of Columbus v. Ours Garage and Wrecker Service, Inc.*, 536 U.S. 424, 426, 122 S.Ct. 2226, 2229, 153 L.Ed.2d 430, 444 (2002). *In re: West Virginia Asbestos Litigation*, 215 W.Va. 39, 42–43, 592 S.E.2d 818, 821–22 (2003).

actions that are clearly subject to preemption include those where West Virginia law attempts to affect the manner in which pension benefits are calculated under federal law, where the pension plan's existence is a critical element of the state law cause of action, or one in which the West Virginia statute expressly refers to ERISA or ERISA plans. Those state law actions that incidentally involve or refer to ERISA plans, but do not present the risk of conflicting or inconsistent state law concerning pension plan regulation are not preempted under federal law.

Syllabus, *Martin Oil Co. v. Philadelphia Life Ins. Co.,* 203 W.Va. 266, 507 S.E.2d 367 (1997). In the instant case, Mr. Smith was disputing the manner in which his benefits were calculated, and indeed, he was trying to *give up* those benefits so that he could go back to work. We have noted that:

> The courts have further recognized that the mere fact that the relief which is to be afforded to an employee or former employee under state law may involve an employee benefit plan does not mean that the case is subject to ERISA preemption. *Martori Brothers Distributors, Inc. v. James–Massengale,* 781 F.2d 1349 (9th Cir.1986), *cert. denied* 479 U.S. 1018, 107 S.Ct. 670, 93 L.Ed.2d 722 (1986); *Schultz v. National Coalition of Hispanic Mental Health Organizations,* 678 F.Supp. 936 (D.D.C.1988).

*Donaldson Mine Co. v. Human Rights Com'n,* 187 W.Va. 631, 637, 420 S.E.2d 902, 908 (1992) *(per curiam ).* We cannot see how the mere fact that Mr. Smith participated in an ERISA-covered pension plan requires preemption of his state court claims of discrimination. We do not believe the resolution of Mr. Smith's claim in state court will endanger our federal law with "the risk of conflicting or inconsistent state law." *Martin Oil, supra.* Accordingly, we find that the

Employee Retirement Income Security Act does not preempt Mr. Smith's claim, and reverse the lower court on this point.

■ The lower court also found that the jurisdictional provisions of the Labor Management Relations Act (codified at 29 U.S.C. § 185 *et seq.* (1947)) preempted Mr. Smith's claims because he, as a member of the union, had participated in a collective bargaining agreement (sometimes referred to as a CBA). The Court has addressed the application of the LMRA: "An application of state law is pre-empted by § 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185 (1947) (1994 ed.), *only* if such application requires the interpretation of a collective-bargaining agreement." Syl. pt. 1, *Greenfield v. Schmidt Baking Co., Inc.,* 199 W.Va. 447, 485 S.E.2d 391 (1997) (emphasis added). Our holding in *Greenfield* was based in part upon the United States Supreme Court decision in *Allis–Chalmers Corp. v. Lueck,* 471 U.S. 202, 105 S.Ct. 1904, 85 L.Ed.2d 206 (1985).[8] And as the Justices pointed out, it was not the intent of Congress to preempt all labor disputes.

> Clearly § 301 does not grant the parties to a collective-bargaining agreement the ability to contract for what is illegal under state law. In extending the pre-emptive effect of § 301 beyond suits for breach of contract, it would be inconsistent with congressional intent under that section to preempt state rules that proscribe conduct, or establish rights and obligations, independent of a labor contract.

*Allis–Chalmers Corp.,* 471 U.S. at 212, 105 S.Ct. at 1912, 85 L.Ed.2d at 216. In addition,

> [not] ... every state-law suit asserting a right that relates in some way to a provision in a collective bargaining agreement, or more generally to the parties to such an

---

**8.** As the U.S. Supreme Court explained, preemption under the Labor Management Relations Act is grounded in substantial part on the desire for uniformity in the interpretation of labor contracts:

> The interests in interpretive uniformity and predictability that require that labor-contract disputes be resolved by reference to federal law also require that the meaning given a contract phrase or term be subject to uniform

federal interpretation. Thus, questions relating to what the parties to a labor agreement agreed, and what legal consequences were intended to flow from breaches of that agreement, must be resolved by reference to uniform federal law, whether such questions arise in the context of a suit for breach of contract or in a suit alleging liability in tort.

*Allis–Chalmers Corp.,* 471 U.S. at 211, 105 S.Ct. at 1911, 85 L.Ed.2d at 215.

agreement, necessarily is pre-empted by § 301. The full scope of the pre-emptive effect of federal labor-contract law remains to be fleshed out on a case-by-case basis. *Id.,* 471 U.S. at 220, 105 S.Ct. at 1916, 85 L.Ed.2d at 221. This Court recognized the necessity of a case-by-case approach in Syllabus Point 5 of *Greenfield, supra,* where we held that "[a] determination of pre-emption under § 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185 (1947) (1994 ed.), requires a fact specific analysis." Finally, in *Caterpillar, Inc. v. Williams,* 482 U.S. 386, 107 S.Ct. 2425, 96 L.Ed.2d 318 (1987), the United States Supreme Court explained:

> [A] *defendant* cannot, merely by injecting a federal question into an action that asserts what is plainly a state-law claim, transform the action into one arising under federal law, thereby selecting the forum in which the claim shall be litigated.[9]

482 U.S. at 399, 107 S.Ct. at 2433, 96 L.Ed.2d at 331.

This Court has on several occasions applied the law set forth above to various factual scenarios. A brief review of these cases is helpful in deciding the issue currently before us. In *Bailey v. Norfolk and Western Railway Co.,* 206 W.Va. 654, 527 S.E.2d 516 (1999), longstanding railroad employees brought State claims for age discrimination in seniority placement following forced promotions. Specifically, senior brakemen hired prior to 1985 were required by a collective bargaining agreement to accept promotion to the position of conductor where they would be placed on the bottom of the conductor seniority roster, effectively stripping them of the years of seniority they had accrued as brakemen. In contrast, those hired after 1985 were permitted, under a different collective bargaining agreement, to use their brakemen seniority when promoted to the conductor position. The Railroad contended that this placement was governed by

a 1954 labor agreement requiring the Railroad to place the plaintiffs at the bottom of the seniority roster. In their age discrimination suit, the plaintiffs did not challenge the Railroad's authority to force-promote the brakemen, but asserted that the Railroad's legitimate force-promotion did not justify discrimination in their placement on the seniority roster.

This Court found that the plaintiffs' age discrimination claim was not preempted by § 301, and reasoned:

> [W]e conclude that ... this state law discrimination claim is not exclusively dependent upon the terms of the collective bargaining agreements. The Plaintiffs do not directly attack the agreements or allege a violation thereof, but instead allege that the Railroad discriminated against them in a more general effort to remove them from its workforce through any means available to it, including discriminatory application of the collective bargaining agreements, intimidation, and hostile comments directed toward older workers and based upon the age of those workers.

*Bailey,* 206 W.Va. at 666, 527 S.E.2d at 528 (footnote omitted).

In *Greenfield,* 199 W.Va. 447, 485 S.E.2d 391 (1997), the defendant employer, Schmidt Baking, responded to a grievance filed by the Union regarding eligibility of part-time employees for sick pay benefits under the collective bargaining agreement by posting a letter near the time clock in the plant. The letter discussed the abuse of sick pay and specifically named the plaintiff, Greenfield, among others, as a recipient of sick pay on a habitual basis whom the company would investigate for the presence of abuse/fraud. Greenfield subsequently sued Schmidt Baking for defamation/libel, invasion of privacy, and intentional infliction of emotional distress. Schmidt thereafter filed a motion for summary judgment asserting that Green-

---

9. The first part of that quotation reads:

[T]he presence of a federal question, even a § 301 federal question, in a defensive argument does not overcome the paramount policies embodied in the well-pleaded complaint rule—that the plaintiff is the master of the complaint, that a federal question must appear on the face of the complaint, and that the plaintiff may, by eschewing claims based on federal law, choose to have the cause heard in state court....

482 U.S. at 398–99, 107 S.Ct. at 2433, 96 L.Ed.2d at 331.

field's claims implicated the collective bargaining agreement and were, therefore, preempted by § 301 of the Labor Management Relations Act. The circuit court granted the motion after deciding that the issues to be decided required interpretation of the collective bargaining agreement. This Court reversed. After discussing at length the specific elements of the torts alleged by Greenfield, we concluded that a determination of the presence or absence of these elements did not require an interpretation of the collective bargaining agreement.[10] We believe much the same is true in Mr. Smith's case.

Section 301 preemption was also the primary issue in *Ash v. Ravens Metal Products, Inc.*, 190 W.Va. 90, 437 S.E.2d 254 (1993). In *Ash*, former employees of the defendant, Ravens Metal Products, Inc., filed a suit contending that the defendant refused to pay them the vacation pay they had earned prior to a lengthy strike, during which the employees were terminated from their employment. This Court rejected the defendant's argument that the former employees' Wage Payment and Collection Act claim was preempted by § 301. We stated:

> Interpretation of the collective bargaining agreement is not at issue—both sides acknowledge that the agreement called for vacation pay to be remitted by Ravens to the employees if they worked one thousand hours in a year. . . .
>
> Despite asserting that the application of W. Va.Code, 21–5–4 [of the Wage Payment and Collection Act], requires an interpretation of the collective bargaining agreement, the employer fails to state what interpretation is required. We conclude that no interpretation is required, only a calcula-

tion of the agreement's vacation pay provisions to the actual pay scale of the employees.

190 W.Va. at 96, 437 S.E.2d at 260 (footnote omitted).

Finally, in *Yoho v. Triangle PWC, Inc.*, 175 W.Va. 556, 336 S.E.2d 204 (1985), the plaintiff, Ms. Yoho, was seriously injured while working as a utility laborer for the defendant, Triangle PWC, Inc., and she was awarded temporary total disability benefits. Ms. Yoho subsequently filed a *Mandolidis* action against her employer.[11] A year after Ms. Yoho's injury, while she was still receiving temporary total disability payments, her employer terminated her employment pursuant to the provisions of a collective bargaining agreement as a result of her unavailability for work over the preceding twelve-month period. Ms. Yoho responded by suing Triangle for a violation of public policy, discriminatory discharge in violation of Workers' Compensation law, and intentional infliction of emotional distress. The trial court granted Triangle's motion to dismiss on the grounds that Ms. Yoho's claim was preempted by federal labor law as inextricably intertwined with the interpretation of the collective bargaining agreement. This Court reversed, and concluded:

> In the case before this Court, Elizabeth Yoho's state law claim is not dependent upon analysis of the terms of her collective bargaining agreement and, therefore, falls into that category of cases which Congress did not intend to pre-empt.

175 W.Va. at 560, 336 S.E.2d at 208.

Mr. Smith directs our attention to the United States Supreme Court decision in *Wright v. Universal Maritime Service Corp.*

---

**10.** We do note, however, that the opposite conclusion was reached by this Court in *Tolliver v. Kroger Co.*, 201 W.Va. 509, 498 S.E.2d 702 (1997). In that case, the plaintiff employee filed an action for intentional infliction of emotional distress and assault and battery against her employer based on allegations that her supervisors "watched her perform inventories" and "yelled at her." *Tolliver*, 201 W.Va. at 514, 498 S.E.2d at 707. We concluded that § 301, if properly raised, preempted the intentional infliction of emotional distress claim because "Mrs. Tolliver's claim centered on her job duties and the performance of those duties." *Id.*

We also found preemption applied in *Chapple v. Fairmont General Hospital, Inc.*, 181 W.Va. 755, 384 S.E.2d 366 (1989). There, after the plaintiff was fired for insubordination, she sued her former employer alleging breach of employment contract. The employer/employee relationship was covered by a collective bargaining agreement that provided that "the Hospital shall have the right to ... discharge or otherwise discipline an employee for just cause." 181 W.Va. at 757, 384 S.E.2d at 368.

**11.** *See Mandolidis v. Elkins Industries, Inc.*, 161 W.Va. 695, 246 S.E.2d 907 (1978).

525 U.S. 70, 119 S.Ct. 391, 142 L.Ed.2d 361 (1998). Although that case did not turn on federal preemption, the logic employed by the high Court is applicable to our instant case.

Mr. Wright worked as a longshoreman. Both a collective bargaining agreement (the Universal Maritime labor contract) and a pension plan (the Longshore Seniority Plan) applied to his job. Like Mr. Smith, Mr. Wright had received a disability retirement, but later recovered and attempted to go back to work. Thwarted in his attempt, Mr. Wright ultimately filed a complaint under the Americans with Disabilities Act, but the 4th Circuit Court of Appeals ruled that Mr. Wright's ADA claim was barred by application of his labor contract. The United States Supreme Court explained:

> The cause of action Wright asserts arises not out of contract, but out of the ADA, and is distinct from any right conferred by the collective-bargaining agreement. To be sure, respondents argue that Wright is not qualified for his position as the CBA requires, but even if that were true, he would *still* prevail if the refusal to hire violated the ADA.

*Wright v. Universal Maritime Service Corp.* 525 U.S. 70, 79, 119 S.Ct. 391, 396, 142 L.Ed.2d 361, 370 (1998) (citations omitted).

While the entirety of Mr. Wright's action concerned federal, and not state law, the point made by the Court is applicable to the instant case. Mr. Smith is not arguing about some aspect of his pension plan, or a particular term of the contract regarding hours or benefits. He claims that GM violated the law in a variety of ways as it considered and rejected his request to return to his job. We agree that many disputes over terms of a union contract or pension plan would be preempted, but that is not what Mr. Smith argues. What he argues is that his independent, state-created, statutory rights have been violated by GM, and that these rights are "distinct from any right conferred by the collective-bargaining agreement." *Id.* We agree. Therefore, we reverse the decision of the lower court, and find that Mr. Smith's claims are not preempted by the Labor Relations Management Act.

■ Lastly we address the lower court's finding that Mr. Smith's claim did not meet the statutory definition of discrimination under our Human Rights Act.[12] We note that:

> The West Virginia Human Rights Act, in W. Va.Code, 5–11–3(h) [1994], provides a definition of the term "discrimination." As that section states: "The term 'discriminate' or 'discrimination'" means to exclude from, or fail or refuse to extend to, a person equal opportunities because of race, religion, color, national origin, ancestry, sex, age, blindness, handicap or familial status and includes to separate or segregate[.]

*Harrison County Board of Education v. Carson–Leggett,* 195 W.Va. 596, 599, 466 S.E.2d 447, 450 (1995) (*per curiam*). Mr. Smith maintains that GM, through its human resources manager, lied to Mr. Smith about not having any right to challenge GM's refusal to re-hire him, and lied to him through another employee who told Mr. Smith that GM was "working with him" to get him back to his job, when in fact just the opposite was true. Mr. Smith claims that GM took these steps to prevent his re-employment because of his previous injuries. We believe this claim does meet the statutory definition.

■ We can also look at Mr. Smith's claims in terms of whether or not he made a *prima facie* case of discrimination. This Court has established how a person makes a claim for employment discrimination:

> In order to make a *prima facie* case of employment discrimination under the West Virginia Human Rights Act, W. Va.Code § 5–11–1 *et seq.* (1979), the plaintiff must offer proof of the following:
>
> (1) That the plaintiff is a member of a protected class.
>
> (2) That the employer made an adverse decision concerning the plaintiff.
>
> (3) But for the plaintiff's protected status, the adverse decision would not have been made.

12. We note that GM argues that Mr. Smith never addressed this aspect of the lower court's decision in his petition for appeal. We believe Mr. Smith did address this finding, as a part of his overall argument regarding preemption, and in the context of his discussion relating to GM's allegedly discriminatory actions against him.

Syl. pt. 3, *Conaway v. Eastern Associated Coal Corp.*, 178 W.Va. 164, 358 S.E.2d 423 (1986). We believe Mr. Smith easily met this test. By virtue of his injuries, he is a member of a protected class; GM clearly made an adverse decision by refusing to re-employ him; he has produced substantial evidence that the reason that GM refused to re-employ him was because of his former injuries. We believe that the lower court erred in finding Mr. Smith's claim did not meet the statutory definition of discrimination. Thus, we reverse the decision of the lower court on this point as well.[13]

## IV.

## CONCLUSION

Because we find that Mr. Smith's state law disability discrimination claim is not preempted by the jurisdictional provisions of either the Employee Retirement Income Security Act, codified at 29 U.S.C. § 1144 *et seq.* (1998), or § 301 of the Labor Management Relations Act, codified at 29 U.S.C. § 185 *et seq.* (1947), and because we find that his claim meets the statutory definition of discrimination under our Human Rights Act, we reverse the circuit court's order.

Reversed.

Chief Justice MAYNARD dissents reserves the right to file a dissenting opinion.

Justice STARCHER concurs and reserves the right to file a concurring opinion.

MAYNARD, Chief Justice, dissenting:

I dissent because I believe that Mr. Smith's disability claim is clearly preempted by the federal Labor Management Relations Act (hereafter "LMRA").

This Court held in Syllabus Point 4 of *Greenfield v. Schmidt Baking Co., Inc.*, 199 W.Va. 447, 485 S.E.2d 391 (1997) that "[a]n application of state law is pre-empted by § 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185 (1947) (1994 ed.), only if such application requires the interpretation of a collective-bargaining agreement." Our holding in *Greenfield* was based on the Supreme Court's determination that "[a] state rule that purports to define the meaning or scope of a term in a [labor] contract suit ... is preempted by federal labor law." *Allis–Chalmers Corp. v. Lueck,* 471 U.S. 202, 210, 105 S.Ct. 1904, 1911, 85 L.Ed.2d 206 (1985). Further, "when resolution of a state-law claim is substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract, that claim must either be treated as a § 301 claim or dismissed as preempted by federal labor-contract law." *Id.,* 471 U.S. at 220, 105 S.Ct. at 1916 (citation omitted). Preemption under the LMRA is grounded in substantial part on the desire for uniformity in the interpretation of labor contracts. The Supreme Court has explained:

> The interests in interpretive uniformity and predictability that require that labor-contract disputes be resolved by reference to federal law also require that the meaning given a contract phrase or term be subject to uniform federal interpretation. Thus, questions relating to what the parties to a labor agreement agreed, and what legal consequences were intended to flow from breaches of that agreement, must be resolved by reference to uniform federal law, whether such questions arise in the context of a suit for breach of contract or in a suit alleging liability in tort. Any other result would elevate form over substance and allow parties to evade the requirements of § 301 by relabeling their

---

**13.** GM argues, as a cross-assignment of error, that the Administrative Law Judge who rendered the decision in this case had resigned, and had no authority to issue a decision. We note that the record indicates that during the pendency of this case before the Human Rights Commission the Administrative Law Judge originally assigned, Katherine Dooley, notified the parties on April 11, 2001 that she was ending her employment with the Commission. The parties were given the option of allowing ALJ Dooley to complete the case, or to notify the Commission that they consented to the appointment of a new ALJ. Mr. Smith consented to a new ALJ, but GM failed to do so before ALJ Dooley issued a final opinion on May 1, 2001. ALJ Dooley had heard the evidence and seen the witnesses in person and was in the best position to judge the credibility of both. Moreover, GM had three weeks to consent to the appointment of a new ALJ and did not. We do not believe that allowing ALJ Dooley to complete the case in any way deprived GM of any due process rights.

contract claims as claims for tortious breach of contract.

*Allis–Chalmers Corp.*, 471 U.S. at 211, 105 S.Ct. at 1911.

On several occasions, this Court has found that state law claims were preempted by the LMRA. For example, in *Tolliver v. Kroger Co.*, 201 W.Va. 509, 498 S.E.2d 702 (1997), the plaintiff employee filed an action for intentional infliction of emotional distress and assault and battery against her employer based on allegations that her supervisors "watched her perform inventories" and "yelled at her." *Tolliver*, 201 W.Va. at 514, 498 S.E.2d at 707. We concluded that § 301, if properly raised, preempted the intentional infliction of emotional distress claim because "Mrs. Tolliver's claim centered on her job duties and the performance of those duties. The purpose of a CBA ['collective bargaining agreement'] is to resolve disputes between the employer and the employee relating to the rates of pay, hours of work, and conditions of employment." *Id.* We further explained that "[t]here can be no dispute. The very essence of Mrs. Tolliver's claim resulted from her job performance and her work relationship with her immediate supervisor. As such, resolution of Mrs. Tolliver's intentional infliction of emotional distress claim necessarily requires interpretation and application of the CBA." 201 W.Va. at 515, 498 S.E.2d at 708. We concluded, however, that Kroger waived § 301 preemption by failing to raise it.

Likewise, in *Chapple v. Fairmont General Hospital, Inc.*, 181 W.Va. 755, 384 S.E.2d 366 (1989), this Court found that § 301 preemption applied. There, after the plaintiff was fired for insubordination, she sued her former employer alleging breach of employment contract. The employer/employee relationship was covered by a collective bargaining agreement that provided that "the Hospital shall have the right to ... discharge or otherwise discipline an employee for just cause." 181 W.Va. at 757, 384 S.E.2d at 368. We concluded that § 301 of the LMRA preempted the plaintiff's state contract law claim, and opined:

> The collective bargaining agreement in the instant case defines a grievance as "a dispute raised by an employee or the Union involving interpretation or application of any provision of this Agreement, including any discipline or discharge of an employee in the bargaining unit." Obviously this dispute between appellant and the Hospital involving her discharge is clearly covered by the collective bargaining agreement.

181 W.Va. at 759, 384 S.E.2d at 370.

As set forth in the majority opinion, Mr. Smith worked under a collective bargaining agreement between the United Auto Workers union and GM which provided:

(f) Retirement as follows:

(1) An employee who retires, or who is retired under the terms of the Pension Plan, shall cease to be an employee and shall have seniority canceled.

(2) An employee who has been retired on a permanent and total disability pension and who hereby has broken seniority in accordance with subsection (1) above, but, who recovers and has pension payments discontinued, shall have seniority reinstated as though the employee had been on a sick leave of absence during the period of disability retirement, provided however, if the period of disability retirement was for a period longer than the seniority the employee had at the date of retirement, the employee shall, upon the discontinuance of the disability pension, be given seniority equal to the amount of seniority the employee had at the date of such retirement.

According to a local agreement between the Martinsburg GM plant and the local union, if a retiree meets the two criteria to return to work set forth in paragraph 64(f)(2) above, he or she then may be returned to the job held before retirement. The sole issue in this case is whether Mr. Smith meets these criteria, and this issue must be decided by federal, not state law.

First, a federal question clearly appears on the face of Mr. Smith's July 24, 1998, complaint filed with the Human Rights Commission. Paragraph six of the complaint states, "[p]ursuant to the GM Collective Bargaining Agreement, ¶ 64(f)(2) [Exhibit One] Smith is eligible to have his seniority reinstated if he recovers and has his pension payment discontinued." Clearly, Mr. Smith's claim is based on a provision of the collective bargaining agreement. He has no right under West Virginia law to have his seniority reinstated after he retired and ceased to be an employ-

ee of the company. Rather, such a right is granted only by the collective bargaining agreement. The very essence of Mr. Smith's claim is that he has met the conditions necessary for reinstatement of seniority, *i.e.*, recovery and discontinuation of his pension payments, but that GM has violated the agreement by failing to reinstate his seniority.

Also, Mr. Smith's claim requires the interpretation of a term of the collective bargaining agreement, specifically the term "recover." Said another way, resolution of Mr. Smith's disability discrimination claim is substantially dependent upon analysis of the provision of the collective bargaining agreement that says that a retiree receiving a permanent and total disability pension and who has broken seniority but who recovers and has pension payments discontinued shall have seniority reinstated. As stated by the Supreme Court in *Allis–Chalmers, supra,* "questions relating to what the parties to a labor agreement agreed, and what legal consequences were intended to flow from breaches of that agreement, must be resolved by reference to uniform federal law[.]" 471 U.S. at 211, 105 S.Ct. at 1911. Therefore, the interests of interpretive uniformity and predictability require that the term "recover" in the collective bargaining agreement be interpreted by reference to federal law instead of state tort law. Otherwise, the interpretation of the term "recover" in GM's collective bargaining agreement may depend upon the jurisdiction in which the claim is brought. Such a result would be at odds with federal labor law.

Let me be perfectly clear. This is not a case in which the applicable discrimination law can be applied without reference to the collective bargaining agreement. A determination of Mr. Smith's qualification to have his seniority reinstated can be made *only* with reference to the collective bargaining agreement. Specifically, as a retiree on a permanent and total disability pension, Mr. Smith is qualified to have his seniority reinstated *only* if he recovers and has his pension payments discontinued. In other words, the crux of the issue is whether the employer's conduct in denying reinstatement of seniority to Mr. Smith is consistent with the terms of the collective bargaining agreement. Other-

wise, there is nothing in state law that provides to Mr. Smith the right to have his seniority reinstated. It must be emphasized that Mr. Smith did not apply for an entry level job with GM as a new applicant. If these were the facts, our State law would govern. Instead, Mr. Smith wants to be reinstated to his power sweeper job at the same level of seniority he enjoyed upon retirement. Nothing outside of the terms of the collective bargaining agreement grants him this right.

In sum, the majority opinion is anti-labor. It ignores clear precedent and sidesteps federal labor law and policy, all in a misguided attempt to help a single retired employee who already has a remedy under the collective bargaining agreement. By taking this unfortunate route, the majority opinion permits collective bargaining agreements to be challenged by state law. The result is a grave disservice to union workers who depend upon the sanctity of their collective bargaining agreements to provide them with secure employment and benefits. Accordingly, for the reasons stated above, I respectfully dissent.

STARCHER, J., concurring.

(Filed July 8, 2004)

Neither the Labor Management Relations Act ("LMRA"), nor the Employee Retirement Income Security Act ("ERISA"), were designed by Congress to pre-empt state laws that proscribe conduct or establish civil rights which operate independently of a collective bargaining agreement or employee benefit plan. Employee rights under state law—like those under our Human Rights Act—exist independently of any job-related agreement or plan, are nonnegotiable, and cannot be waived by the parties. As the majority opinion makes clear, if a state-law-based claim can be resolved without interpreting a collective bargaining agreement or an employee benefit plan, then the state-law-based claim is independent of any federal question and is not pre-empted by federal law.

The crux of this case is that appellant Hubert J. Smith alleges that he was—because of his disability and because of his race—denied reinstatement to his job and to his seniority with the appellee, General Mo-

tors Corporation ("GM"), through actions that plainly violated the Human Rights Act. The application of the Human Rights Act to Mr. Smith's allegations does nothing to alter or interpret the GM collective bargaining agreement, nor does the application of the Act in this case alter the mechanics of the GM disability retirement plan. In sum, the conclusion by the Human Rights Commission that GM engaged in discrimination did nothing to alter or interpret any agreement or plan; it is therefore plain that Mr. Smith's claims are not preempted by any federal law.

Other courts have similarly concluded that discrimination claims under state law are not preempted by the LMRA or ERISA, so long as the application of the state law does not require an interpretation of, or alteration to, a collective bargaining agreement or benefit plan. As one court stated, "[i]n race, sex, and age cases, interpretation of the collective bargaining contract is unnecessary .... The right to be free of race, sex, or age discrimination is independent of any ancillary rights contained in a collective bargaining agreement." *Betty v. Brooks & Perkins*, 446 Mich. 270, 521 N.W.2d 518, 524 (1994). Likewise, another court allowing an employee to pursue a state law disability claim found that "ERISA does not preempt state law claims when the claims 'affec[t] only [an employee's] employer/employee relationship with [an employer] and *not* her administrator/beneficiary relationship with the company.'" *Rokohl v. Texaco, Inc.*, 77 F.3d 126, 129 (5th Cir.1996) (citations omitted). This is because "an employer may not use its ERISA plan as a 'gimmick' to trigger preemption and therefore avoid litigation in state court." *Id.* at 130.

Mr. Smith established a clear-cut case of discrimination under our Human Rights Act. Mr. Smith sought to return to work at GM pursuant to GM's policies and the collective bargaining agreement. Instead of treating him fairly, GM met Mr. Smith's request to return to work with three years of Kafkaesque responses designed solely to prevent Mr. Smith's return to work. Mr. Smith demonstrated before the Human Rights Commission that his case was much like that of other disabled employees at the GM facility, and that discrimination against disabled employees was very pervasive.[1]

In sum, the record firmly establishes that General Motors Corporation discriminated against Hubert Smith in violation of our Human Rights Act—and did so regardless of any terms in any collective bargaining agreement or benefit plan. I therefore concur with the majority opinion.

---

1. As one court noted, in affirming a jury verdict against GM and in favor of a disabled employee named Robert Fox, there was substantial evidence of a pervasive environment hostile to disabled workers at the Martinsburg GM plant:

 For example, at safety meetings, held each week, Okal referred to the disabled workers as "handicapped people" and "hospital people." Okal and Dame also frequently called Fox and other disabled workers "handicapped MFs"

and "911 hospital people." Fox also testified that Okal instructed the other employees not to talk to the disabled employees. Perhaps because of this, Fox's co-workers ostracized the disabled employees and refused to bring needed materials to the light-duty table where they worked. Fox also testified that Okal refused to permit disabled employees to work overtime. *Fox v. General Motors Corp.*, 247 F.3d 169, 174 (4th Cir.2001).