No. 17-0187 –    *Patrick Morrisey, in his official capacity as West Virginia Attorney General, and The State of West Virginia v. West Virginia AFL-CIO, et al.*

**FILED**

**October 2, 2017**

**released at 3:00 p.m.**
RORY L. PERRY, II CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

Davis, Justice, dissenting:

It is well-established that

"[t]he designation of a union as exclusive representative carries with it great responsibilities. The tasks of negotiating and administering a collective-bargaining agreement and representing the interests of employees in settling disputes and processing grievances are continuing and difficult ones. They often entail expenditure of much time and money. The services of lawyers, expert negotiators, economists, and a research staff, as well as general administrative personnel, may be required. Moreover, in carrying out these duties, *the union is obliged fairly and equitably to represent all employees . . ., union and nonunion, within the relevant unit.*"

*Lenhert v. Ferris Faculty Ass'n*, 500 U.S. 507, 552-53, 111 S. Ct. 1950, 1976, 114 L. Ed. 2d 572 (1991) (Scalia, J., concurring, in part, and dissenting, in part) (emphasis added) (quoting *Abood v. Detroit Bd. of Educ.*, 431 U.S. 209, 221-22, 97 S. Ct. 1782, 1792-93, 52 L. Ed. 2d 261 (1977) (additional quotations and citations omitted; footnote omitted)). The majority's misapprehension of the realities of the collective bargaining process notwithstanding,[1] the

_____

[1] My brethren suggest that the Respondent unions, themselves, have created the problem which they now ask the judiciary to solve by declaring the subject statutory scheme unconstitutional insofar as the unions, themselves, have sought the coveted position as exclusive representative of their employees, and, thus, necessarily have incurred and assumed

(continued...)

1

Respondent unions herein acknowledge and embrace their duty of fair representation and neither shirk nor deny their responsibility to union and nonunion members alike.

In its opinion, the majority opines that the case *sub judice* raises concerns of fairness. This is an absolutely correct statement of the issues underlying the instant proceeding because the Respondent unions rightfully question how it can be fair that they are *required* to expend time and resources to ensure that nonunion members are equally represented while those same nonunion members are allowed a *free ride*[2] to benefit from the

---

[1](...continued)
the expenses attributed to the free-riding nonunion employees. This brief summation of the majority's understanding of the issue demonstrates an inordinate lack of comprehension of basic tenets of labor law: the election of an exclusive union representative is a matter of necessity, not of choice. But for the existence of an exclusive union representative to facilitate negotiations, there would be no collective bargaining agreement to reconcile and govern the often divergent and discordant interests of employers and employees in the first instance, and the entire statutory scheme at issue herein, which seeks to regulate such union activities, would be a mere nullity.

[2]The term "free rider" refers to nonunion members who nevertheless are represented by their unit's exclusive representative union: "'the free rider Congress had in mind was the employee the union was required to represent and from whom it could not withhold benefits obtained for its members.'" *Lenhert v. Ferris Faculty Ass'n*, 500 U.S. 507, 552-53, 111 S. Ct. 1950, 1976, 114 L. Ed. 2d 572 (1991) (Scalia, J., concurring, in part, and dissenting, in part) (quoting *Ellis v. Brotherhood of Ry., Airline & S.S. Clerks, Freight Handlers, Express & Station Emps.*, 466 U.S. 435, 452, 104 S. Ct. 1883, 1894, 80 L. Ed. 2d 428 (1984)).

union's collective bargaining activities without having to contribute to the cost of providing such services.[3]  Indeed, there exists

> a correlation between the rights and duties of the union, on the one hand, and the nonunion members of the bargaining unit, on the other.  Where the state imposes upon the union a duty to deliver services, it may permit the union to demand reimbursement for them; or, looked at from the other end, *where the state creates in the nonmembers a legal entitlement from the union, it may compel them to pay the cost.*

*Lenhert*, 500 U.S. at 556, 111 S. Ct. at 1978, 114 L. Ed. 2d 572 (Scalia, J., concurring, in part, and dissenting, in part) (emphasis added).  This *quid pro quo* arrangement, condoned by Congress and secured by constitutional protections, seeks to promote the dual interests of unions in providing collective bargaining services to all employees without regard for union membership and of employees in choosing not to become union members, while ensuring that all employees benefitting from such services share in the cost of their provision.

---

[3]To this end,

> [u]nder th[e] [fair representation] doctrine, the exclusive agent's statutory authority to represent all members of a designated unit includes a statutory obligation to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct.

*Vaca v. Snipes*, 386 U.S. 171, 177, 87 S. Ct. 903, 910, 17 L. Ed. 2d 842 (1967) (citation omitted).

3

Nevertheless, while the majority astutely recognizes that matters of public policy are within the realm of the Legislature, it fails to appreciate that matters of constitutionality squarely reside in the judicial branch of government. By this I mean that while statutes must be read so as to conform to the constitution where possible,[4] it is not the Court's province to contort the law to achieve a finding of constitutionality by resorting to "disingenuous evasion" to achieve a result that clearly is contrary to legislative intent. *Communications Workers of Am. v. Beck*, 487 U.S. 735, 762, 108 S. Ct. 2641, 2657, 101 L. Ed. 2d 634 (1988) (internal quotations and citations omitted). In establishing the federal framework within which the instant controversy is reposed, the majority stops short of considering the law governing the resolution of the issue herein presented, concluding succinctly that, "[i]n sum, *under federal law, states may decide whether to allow or prohibit employers and unions to negotiate agreements* requiring compulsory union membership, or *requiring nonunion employees to pay dues or fees to the union*." (Emphasis added). Because the majority fails to consider the applicable federal law, however, it inevitably misconstrues the limitations on states' authority to regulate union activity and ignores the clear recognition that *Congress*, *not the states*, has defined the extent to which a nonunion employee may be

---

[4]*See Frantz v. Palmer*, 211 W. Va. 188, 194, 564 S.E.2d 398, 404 (2001) (recognizing Court's "obligation to respect the legislative will and to uphold all constitutionally valid legislative provisions" (citation omitted)); *State ex rel. City of Charleston v. Coghill*, 156 W. Va. 877, 883, 207 S.E.2d 113, 118 (1973) ("Acts of the Legislature are always presumed to be constitutional, and this Court will interpret legislation in any reasonable way which will sustain its constitutionality.").

4

required to pay representational fees to a union.  In light of these shortcomings in the majority's opinion, I respectfully dissent.

## *Preemption*

Congress enacted the Labor Management Relations Act ("LMRA")[5] to provide uniformity and predictability in the field of labor law by establishing the permissible bounds of relationships between unions, employers, and employees.  "'[I]n passing the NLRA[6] Congress largely displaced state regulation of industrial relations,' and thus, states 'may not regulate activity that the NLRA protects, prohibits, or arguably protects or prohibits.'" *Simms v. Local 1752, Int'l Longshoremen Ass'n*, 838 F.3d 613, 617 (5th Cir. 2016) (quoting *Wisconsin Dep't of Indus., Labor & Human Relations v. Gould Inc.*, 475 U.S. 282, 286, 106 S. Ct. 1057, 1061, 89 L. Ed. 2d 223 (1986)) (footnote added; additional citation omitted). Section 8(a)(3) of the LMRA precludes compulsory union membership as a condition of hiring for employment, but still allows employers and unions to enter agreements to require, as a condition of continued employment, employees to join a union after they have been employed for a specified period of time.  *See generally* 29 U.S.C. § 158(a)(3).  The validity of such an arrangement, while permitted under *federal* law, may nevertheless be altered by

---

[5]This Act is also known as the Taft-Hartley Act.

[6]The NLRA, *i.e.*, National Labor Relations Act, is the predecessor to the LMRA.

the exercise of a state's authority to determine whether such compulsory union membership may be required under *state* law.  *See* 29 U.S.C. § 164(b) ("§ 14(b)").

Despite Congress' grant of such authority to the states, however, the United States Supreme Court consistently has recognized that free riders, *i.e.*, nonunion members who enjoy the benefits of a union's collective bargaining activities through the union's duty of fair representation but who, as nonunion members, do not correspondingly pay union dues to reimburse the cost of the union's provision of such services, have an "obligation to support union activities . . . germane to collective bargaining, contract administration, and grievance adjustment." *Beck*, 487 U.S. at 745, 108 S. Ct. at 2648, 101 L. Ed. 2d 634.  In this regard, the Supreme Court has recognized that "Congress authorized compulsory unionism only to the extent necessary to ensure that those who enjoy union-negotiated benefits contribute to their cost," *id.*, 487 U.S. at 746, 108 S. Ct. at 2649, 101 L. Ed. 2d 634, "but the 'membership' that may be so required has been 'whittled down to its financial core.'" *Id.*, 487 U.S. at 745, 108 S. Ct. at 2648, 101 L. Ed. 2d 634 (quoting *National Labor Relations Bd. v. General Motors Corp.*, 373 U.S. 734, 742, 83 S. Ct. 1453, 1459, 10 L. Ed. 2d 670 (1963)).  Stated otherwise, "'Congress' decision to allow union-security agreements at all reflects its concern that . . . the parties to a collective bargaining agreement be allowed to provide that there be no employees who are getting the benefits of union representation without paying for

6

them,'"[7] by "ensuring that nonmembers who obtain the benefits of union representation can be made to pay for [their fair share of] them."[8]

Having recognized these corresponding rights and obligations of unions and free-rider nonunion members, it is important to note that the United States Supreme Court *has not declared* that the authority of states to determine their own parameters of union membership extends so far as to require unions to undertake their duty to fairly represent nonunion free riders on a *gratis* basis. And, it further should be noted that this is the foundational context within which Senate Bill 1 was promulgated—not the incomplete historical framework recited in the majority's opinion that completely and conveniently ignores the corollary duty of nonunion members to pay for the services the unions are obligated to provide them.

In light of Congress' intent to permit unions to recoup representational fees from nonunion members and to negotiate with employers to incorporate such terms in collective bargaining agreements, it is clear that the specific terms of such an arrangement must be decided with respect to *federal*, not state, law in the interest of preserving the

---

[7]*Communications Workers of Am. v. Beck*, 487 U.S. 735, 750, 108 S. Ct. 2641, 2651, 101 L. Ed. 2d 634 (1988) (quoting *Oil, Chem. & Atomic Workers, Int'l Union, AFL-CIO v. Mobil Oil Corp.*, 426 U.S. 407, 416, 96 S. Ct. 2140, 2144, 48 L. Ed. 2d 736 (1976)).

[8]*Beck*, 487 U.S. at 759, 108 S. Ct. at 2656, 101 L. Ed. 2d 634.

7

uniform and predictable enforcement of collective bargaining agreements. "Preemption under the LMRA is grounded in substantial part on the desire for uniformity in the interpretation of labor contracts." *General Motors Corp. v. Smith*, 216 W. Va. 78, 88, 602 S.E.2d 521, 531 (2004) (per curiam) (Maynard, C.J., dissenting). In other words,

> [t]he interests in interpretive uniformity and predictability that require that labor-contract disputes be resolved by reference to federal law also require that the meaning given a contract phrase or term be subject to uniform federal interpretation. Thus, questions relating to what the parties to a labor agreement agreed, and what legal consequences were intended to flow from breaches of that agreement, must be resolved by reference to uniform federal law . . . .

*Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 211, 105 S. Ct. 1904, 1911, 85 L. Ed. 2d 206 (1985). As such, "[t]he governing consideration is that to allow the States to control activities that are potentially subject to federal regulation involves too great a danger of conflict with national labor policy." *San Diego Bldg. Trades Council, Millmen's Union, Local 2020 v. Garmon*, 359 U.S. 236, 246, 79 S. Ct. 773, 780, 3 L. Ed. 2d 775 (1959) (footnote omitted). Thus, "[i]t is federal law alone that defines the relationship between the parties to a labor contract, and '[a] state rule that purports to define the meaning or scope of a term in [such] a contract' is preempted." *Lowe v. Imperial Colliery Co.*, 180 W. Va. 518, 523, 377 S.E.2d 652, 657 (1988) (quoting *Allis-Chalmers*, 471 U.S. at 210, 105 S. Ct. at 1911, 85 L. Ed. 2d 206).

Therefore, there can be no question that this area of the law has been preempted by Congress and is not a proper area within which the states may legislate. This is so because arrangements between unions and employers to charge nonunion employees with their proportionate share of the union's collective bargaining expenses necessarily are achieved through the collective bargaining process, itself, and the interpretation of specific terms of a collective bargaining agreement is subject to federal law to ensure consistency in the construction and enforcement of such agreements. *See* Syl. pt. 4, *Greenfield v. Schmidt Baking Co., Inc.*, 199 W. Va. 447, 485 S.E.2d 391 (1997) ("An application of state law is pre-empted by § 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185 (1947) (1994 ed.), only if such application requires the interpretation of a collective-bargaining agreement."). *See also* Syl. pt. 1, *Cutright v. Metropolitan Life Ins. Co.*, 201 W. Va. 50, 491 S.E.2d 308 (1997) ("The Supremacy Clause of the United States Constitution, Article VI, Clause 2, invalidates state laws that interfere with or are contrary to federal law."); Syl. pt. 4, *Lowe*, 180 W. Va. 518, 377 S.E.2d 652 ("While Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185 (1947), does not divest state courts of jurisdiction in labor cases, *the federal labor law is supreme* and is to be applied by state and federal courts alike. *State law to the contrary is preempted.*" (emphasis added)). Accordingly, it is clear that Senate Bill 1's prohibition of the charging of representational agency fees to nonunion members is an invalid exercise of the State's legislative power given

that this particular area of the law has been preempted. To the extent that the majority has upheld this proposed statutory language, it was wrong, and from that decision, I dissent.

*Constitutionality*

Assuming *arguendo* that the subject provision has not been invalidated by federal preemption, the promulgation adopted by the Legislature still cannot stand because it is unconstitutional under both the federal and State constitutions as an unlawful taking of private property. The Fifth Amendment to the United States Constitution, also known as the Takings Clause, prohibits the taking of private property without just compensation therefor. "The Takings Clause provides that 'private property [shall not] be taken for public use without just compensation.' U.S. Const. amend. V." *International Union of Operating Eng'rs Local 370 v. Wasden*, 217 F. Supp. 3d 1209, 1223 (D. Idaho 2016) (mem. decision). Likewise, article III, § 9 of the West Virginia Constitution also precludes the unlawful seizure of property: "Private property shall not be taken or damaged for public use, without just compensation[.]" *Id.*

In the case *sub judice*, the position that the Legislature proposes, and which the majority of the Court endorses, would require unions serving as an exclusive representative to equally serve union and nonunion members alike in their pursuit of collective bargaining activities and their provision of services attendant thereto, while permitting free-riding,

nonunion members to enjoy such benefits without paying a single dime for them. Unquestionably, such free riders would be unjustly enriched while both the unions and their dues-paying members would be unduly, and unfairly, punished by the necessity of absorbing the costs associated with the free riders' representation, which costs inevitably would trickle down from the union's incursion thereof to the countless union members required to subsidize their free-riding coworkers. Moreover, this proposed, and endorsed, arrangement directly contravenes the constitutional prohibitions of taking one's private property both without just compensation and for a private use:

> The two most basic economic rights enjoyed in the United States are (1) that the government may not confiscate private property for public use without just compensation, and (2) that the takings power must be exercised for a public purpose, and so the government may not take the property of one private party for the sole purpose of transferring it to another private party, regardless of whether "just" compensation is paid.

*Sweeney v. Pence*, 767 F.3d 654, 683 (7th Cir. 2014) (Wood, C.J., dissenting) (citing *Kelo v. City of New London, Connecticut*, 545 U.S. 469, 477, 125 S. Ct. 2655, 2661, 162 L. Ed. 2d 439 (2005)). *Accord Riggs v. State Rd. Comm'r*, 120 W. Va. 298, 301, 197 S.E. 813, 814 (1938) ("'Private property shall not be taken or damaged for public use, without just compensation . . . .' West Virginia Constitution, Article III, Section 9. It is imperative that this paramount provision of our organic law be given effect."); Syl. pt. 1, *Hench v. Pritt*, 62 W. Va. 270, 57 S.E. 808 (1907) ("Under our Constitution private property cannot be taken for private use, either with or without compensation.").

11

Absent the ability to seek such contributions from free riders, unions are expected to continue providing their collective bargaining services with no recourse for seeking recoupment of their costs of providing such representation. Legally requiring exclusive representative unions to expend such resources while foreclosing their ability to obtain remuneration therefor amounts to an unlawful, and unconstitutional, taking of private property plain and simple. The unconstitutionality of this arrangement could not be clearer, and, yet, the majority blithely ignores the impudence and inequities attendant to such a scheme, instead blaming the unions for complaining about the representational duties they have agreed to assume. Just because a union voluntarily agrees to assume or willingly seeks the title of exclusive representative, however, does not mean that it should be forced to provide its collective bargaining services free of charge. As exclusive bargaining agents between employers and employees, Congress has recognized the valuable role unions play in creating and maintaining harmonious workplaces and working environments in our country. *See generally Sweeney*, 767 F.3d at 684 (Wood, C.J., dissenting) (discussing benefits from exclusive representative unions enjoyed by employers). That unions accept the responsibilities of exclusive representative status is of no moment. That free-riding nonunion members are being excused from paying their fair share of the union's collective bargaining expenses that have inured to the free riders' benefit is the problem—which the majority declines to acknowledge, much less redress.

12

In short, the majority's failure to recognize these fatal deficiencies of Senate Bill 1 demonstrates its blatant lack of appreciation for the sanctity of basic constitutional protections guaranteed by the Bill of Rights. "In our country, the state is not entitled to force private organizations or persons to render uncompensated services to others. The Takings Clause, which applies to the states, says as much." *Sweeney*, 767 F.3d at 684-85 (Wood, C.J., dissenting). Yet, because exclusive representative unions have an obligation to represent *all* employees in a workplace fairly and without regard for their union membership or affiliation, and the majority has failed to understand that there exists a corollary right to expect nonunion member free riders to bear their proportionate share of the cost of the union's collective bargaining activities, the right to be free from the unfettered taking of one's property no longer is a right guaranteed by the laws of this State. Because the preclusive effect of Senate Bill 1 leaves unions with no ability to enforce the corollary duty of free-riding nonunion members to pay for the services which the unions are obligated to provide to them, and because the majority has upheld the validity of this provision despite its blatant unconstitutionality, I respectfully dissent.

### *Injunctive Relief*

The foregoing analysis of the validity of Senate Bill 1 is essential because it is instructive to the resolution of the pivotal issue presented by the case *sub judice*: are the Respondent unions entitled to the injunctive relief they herein seek. Whether such a

13

determination is made pursuant to the authorities cited in the majority's opinion[9] or according to the standard urged by Justice Workman in her separate opinion,[10] the result should be the same: the Respondents undeniably have established their entitlement to a preliminary injunction to prevent the enforcement of Senate Bill 1 because the Respondent unions have demonstrated the likelihood of success on the merits of their underlying complaint.

Moreover, with respect to the Respondent unions' unconstitutional taking argument, this Court specifically has held that "[a]n injunction lies to prevent the taking of one's private domain, for uses of the public, contrary to the constitutional mandate, regardless of any question of damages." Syl. pt. 3, *Lovett v. West Virginia Cent. Gas Co.*, 65 W. Va. 739, 65 S.E. 196 (1909). *Accord International Union of Operating Eng'rs Local 139 v. Schimel*, 863 F.3d 674, 678 n. 2 (7th Cir. 2017) ("It is well accepted that, when the government has taken property for a private, rather than a public, use, injunctive or declaratory relief may be appropriate." (internal quotations and citations omitted)). *See also* Syl. pt. 4, *Lovett*, 65 W. Va. 739, 65 S.E. 196 ("A question of right, and not one of damages, is raised upon an application for an injunction to prevent the taking of private property for public uses contrary to the Constitution and laws.").

[9]*See Jefferson Cty. Bd. of Educ. v. Jefferson Cty. Educ. Ass'n*, 183 W. Va. 15, 393 S.E.2d 653 (1990); Syl. pt. 4, *State ex rel. Donley v. Baker*, 112 W. Va. 263, 164 S.E. 154 (1932).

[10]*See, e.g.*, *State of West Virginia, By & Through McGraw v. Imperial Mktg.*, 196 W. Va. 346, 472 S.E.2d 792 (1996).

I acknowledge that Congress has granted the states authority to enact laws regulating union activities within their borders. *See generally* 29 U.S.C. § 164(b). However, such grant of authority does not permit states, including West Virginia, to promulgate legislation that is patently unconstitutional. Even the United States Supreme Court has recognized this limitation on states' power. *See Lincoln Fed. Labor Union No. 19129, Am. Fed'n of Labor v. Northwestern Iron & Metal Co.*, 335 U.S. 525, 536, 69 S. Ct. 251, 257, 93 L. Ed. 212 (1949) ("[S]tates have power to legislate against what are found to be injurious practices in their internal commercial and business affairs, *so long as their laws do not run afoul of some specific federal constitutional prohibition, or of some valid federal law.*" (emphasis added; citations omitted)). This Court, however, obviously has not, and, because the majority has complicitly condoned these legislative efforts to trammel the rights of unions and union members throughout this State, I respectfully dissent.