491 S.E.2d 308

**William E. CUTRIGHT, Appellant**

**v.**

**METROPOLITAN LIFE INSURANCE COMPANY, et al., Appellees.**

**William E. CUTRIGHT, Appellee**

**v.**

**METROPOLITAN LIFE INSURANCE COMPANY, et al., Appellants.**

**Nos. 23884, 23956.**

Supreme Court of Appeals of West Virginia.

Submitted April 30, 1997.

Decided July 11, 1997.

Catherine D. Munster, Harold M. Sklar, McNeer, Highland, McMunn & Varner, L.C. Clarksburg, for Cutright.

Jeffrey A. Kimble, Shawn Angus Morgan, Robinson & McElwee Clarksburg, Christopher C. Russell, Porter, Wright, Morris & Arthur, Columbus, Ohio, for Metropolitan, Schlegel & Thomas.

MAYNARD, Justice:

William E. Cutright sued Metropolitan Life Insurance Company (Metropolitan), Regional Manager Michael A. Schlegel and Branch Manager William Thomas for damages arising out of the termination of his employment as an insurance agent with Metropolitan. Both Cutright and Metropolitan filed motions for summary judgment in the Circuit Court of Harrison County, West Virginia. The circuit court granted both sides partial summary relief; however, the questions relating to damages for termination of employment in violation of state law and for accumulated vacation pay were presented before a jury. The jury awarded damages in the amount of $1,010,221.01. Judgment for this amount plus costs and attorney fees was entered against Metropolitan, whose motions for judgment notwithstanding the verdict and a new trial were denied.

Cutright appeals to this Court, requesting that the circuit court's granting of partial summary judgment to Metropolitan, Schlegel and Thomas be reversed. Metropolitan cross-appeals, requesting that the circuit court's granting of summary judgment regarding liability for termination in violation of state law be reversed. These cases have been consolidated on appeal. We believe the court's ruling on the issue of liability should be reversed, but the remainder of the court's summary judgment rulings should be affirmed. Therefore, we affirm in part and reverse in part.

Metropolitan is a mutual life insurance company licensed by the Insurance Commissioner to sell life insurance and sickness and accident insurance in the State of West Virginia. Cutright is a former employee of Metropolitan, who worked for Metropolitan from February 1, 1988, the date he first signed an agreement not to compete, until October 14, 1994. Cutright was employed to work in Metropolitan's Clarksburg, West Virginia, office. Initially, Cutright was employed as an account representative. On January 2, 1989, he was promoted to branch manager. On January 3, 1989, he executed another agreement not to compete. Thereafter, on March 7, 1994, Cutright voluntarily resigned as branch manager and resumed the position of account representative. William Thomas, who had worked as an agent under Cutright, was promoted to the position of branch manager. Cutright held the position of account representative until his employment was terminated by Metropolitan on October 14, 1994, due to insubordination and unprofessional conduct.

After Cutright stepped down from his position as manager, Metropolitan's management began receiving complaints about his hostile, abusive and unprofessional treatment of female co-workers. Margaret Fisher was the branch administrator. Peggy Morris was a senior sales assistant and Sandra Lehosit was a senior clerical sales assistant. The clerical support staff in the Clarksburg office consisted of these three employees, all females. Margaret Fisher stated in her deposition that Cutright repeatedly yelled at the women. Often adding profanity. Fisher also stated he "cursed and yelled and threw things" and even threatened to break the computer. He told one worker her work was "bullshit" and called her a "god-damn-son-of-a-bitch." Thomas, the branch manager, stated in his affidavit that he personally observed Cutright use profanity and yell and curse at the administrative staff. The situation became so bad that the regional manager, Michael Schlegel, asked Fisher and Lehosit to inform him of additional improper behavior.

The clerical employees also complained about the vacation policy that Cutright initiated and enforced. Initially, Cutright told the female clerical workers they could have no more than two weeks of vacation in a row, no more than two weeks of vacation in a

given month, and no vacation could be taken in October, November and December. He later changed the policy to no more than five days of vacation in a row, no more than two weeks of vacation a month, the weeks could not be together, and no vacation time off in October, November, and December. In June 1990, Sandra Lehosit and her husband made vacation plans in advance. Lehosit's husband was a factory worker, whose schedule was not flexible, so he did not have the option of changing his vacation plans. Because of the vacation policy change imposed by Cutright, Ms. Lehosit was forced to cancel her plans and her husband had to go on his vacation without her.

In September 1994, the regional manager met with the female clerical staff to discuss their concerns about the abusive treatment. That same day, the regional manager and the branch manager met with Cutright to discuss the concerns of the clerical staff and to attempt to clear up the problems. Apparently, the meeting had little or no effect. In early October 1994, less than one month after the meeting where Cutright had been cautioned about such conduct, another incident involving crass, hostile behavior and the use of profanity occurred. One evening, as Cutright was leaving Metropolitan's premises, he stated that Peggy Morris was a "fat ass bitch," and added, "those f_____ people are nuts." He admits he made both comments, but states he called Morris only "a fat ass." Finally, Cutright's outrageous treatment of the female clerical employees prompted Margaret Fisher to send an e-mail to Schlegel, informing the regional manager that "the girls are at their breaking point and we cannot continue to take this" kind of treatment from Cutright. One week later, Cutright's employment with Metropolitan was terminated.

The record is replete with numerous other allegations and admissions. Cutright admits he stored and consumed alcohol on company premises in violation of the Manual of Instructions. He also insisted on smoking inside when the company had a no-smoking policy. He signed a policy of insurance affirming he had witnessed the policyholder's signature when, in fact, he had not witnessed the signature.

Cutright also personally retained an assistant, Shellie Davis, to work for him. Davis was previously a Metropolitan employee, whose employment with the company had been terminated. Even though Davis was no longer a Metropolitan employee, Cutright continued to allow her to have full access to Metropolitan's computer system, SONIC. Thomas informed Cutright that Davis could no longer access customer information on the SONIC computer. Schlegel informed Cutright in writing that access to SONIC must be limited to Metropolitan employees because of security reasons and liability concerns. Cutright responded to Schlegel by stating in writing that he would use the computer to enhance his business until he received notice from the legal department notifying all within Metropolitan that this practice was not condoned and must be stopped by all who were utilizing the system. The company sent Cutright a letter, suggesting that Davis become a variable part-time employee. He failed to respond to this suggestion, but contends Davis stopped accessing SONIC on September 20, 1994, the date a region-wide letter was distributed.

At Metropolitan, the branch manager, not account representatives, handle consumer complaints. Nonetheless, Cutright refused to turn over the consumer complaint files that were in his possession when he stepped down from the position of branch manager. He was repeatedly asked to turn over the files, but flatly refused to do so. He even obstinately refused to comply with a direct order of the regional manager. Cutright also admits that when he left Metropolitan, he took with him 2,000 customer files, all client records and "things of that nature" that were in his possession. He repeatedly refused to return the files and records until he was finally ordered by the circuit court to do so.

Sandra Lehosit testified in her deposition that Cutright's wife came into the Metropolitan office openly carrying a pistol in her hand on the day Cutright was terminated. Cutright's wife walked over to Lehosit's desk, pistol in hand, stating she wanted to talk to Lehosit. While standing over the

desk and holding the pistol, she stated that it was the women's fault the lives of Cutright, herself, and their children had been ruined by the termination. Lehosit realized Cutright's wife was upset and had a gun; consequently, Lehosit tried to calm her. Ms. Cutright handed the gun to Thomas when he opened the door to his office. She then left, only to return later in the day to continue her tirade. It later turned out the gun was not loaded and was a "BB" or pellet gun, which had been borrowed from a co-worker and was being returned. However, this fact was not known at the time Ms. Cutright entered the office carrying a gun and accosted Sandra Lehosit with it.

Cutright contends that Schlegel's secretary heard Schlegel tell somebody over the telephone that he "had enough to put Cutright behind bars." The secretary supposedly told a Metropolitan employee, who told another Metropolitan employee, who finally conveyed this information to Cutright. Based on this assertion, Cutright included a claim for defamation in his complaint.

Cutright filed a six-count complaint and also sought declaratory judgment on two counts in circuit court. The six counts include: Count I, wrongful discharge for whistleblower activities; Count II, discharge in violation of W.Va.Code § 33–12A–3; Count III, violation of W.Va.Code § 21–5–1, regarding payment for accumulated vacation time; Count IV, tortious interference with third party contract;[1] Count V, tortious interference with prospective business relationships;[2] and Count VI, defamation. Cutright sought declaratory judgment regarding Count VII, requesting that the agreements not to compete, which he had signed, be declared invalid; and Count VIII, requesting that the 2,000 customer files retained by Cutright upon his termination be declared his.

Metropolitan counterclaimed, seeking preliminary and permanent relief to enforce the agreements not to compete and to retrieve

the customer files. Following a hearing, the circuit court granted a preliminary injunction to Metropolitan and ordered Cutright to return all of the files and to abide by the terms of the agreements he had executed.

When discovery was completed, Cutright and Metropolitan both moved for summary judgment. Metropolitan sought judgment on all counts of the complaint and on their counterclaim. Cutright sought summary judgment on the counts dealing with discharge in violation of state law and accrued vacation pay. The court found "that Metropolitan has demonstrated a legitimate, non-pretextual and non-retaliatory reason for Plaintiff's discharge. The record is replete with evidence documenting complaints of Plaintiff's conduct toward the Branch Manager and Branch Administrator, including complaints of insubordinate behavior and inappropriate remarks." Therefore, the court granted Metropolitan summary judgment as to the wrongful discharge claim or Count I of the complaint.

The court also found "that [Cutright's] several appointments, together with the Manual of Instructions for Sales Representatives created a written contractual relationship for in excess of five years as a matter of law[,]" and "that the Plaintiff was not notified of the termination of his contractual relationship with Metropolitan by certified mail at least ninety (90) days prior to the date of his termination, nor provided with a statement of the grounds upon which Metropolitan based its decision to terminate the contractual relationship, and that the grounds for termination are not statutorily sufficient." Therefore, the court granted Cutright summary judgment as to liability regarding termination in violation of state law or Count II of the complaint.

The court denied summary judgment regarding accumulated vacation pay. As to Cutright's contention that Schlegel's and Thomas' actions in terminating him deprived him of the benefit of his contract and tor-

---

1. Count IV alleges Schlegel and Thomas pretextually terminated Cutright's contractual relationship with Metropolitan.

2. Count V alleges Metropolitan and Thomas sent letters to various Metropolitan policyholders,

which interfered with Cutright's expectation that he would continue to be employed in the insurance industry and would be able to market products to his former clientele.

tiously interfered with his contractual relationship with Metropolitan, the court granted the defendants summary judgment. As to Cutright's contention that Metropolitan and Thomas tortiously interfered with prospective business relationships, the court also granted the defendants summary judgment. Schlegel and Thomas were then dismissed from the action with prejudice. As to the defamation claim against Schlegel, the court granted Schlegel summary judgment. The court concluded the agreements not to compete were valid and enforceable and the policyholders' files belonged to Metropolitan; therefore, Metropolitan was granted summary judgment on these counts and on Metropolitan's counterclaim. A trial date was set to determine damages regarding discharge in violation of state law and accumulated vacation pay.

At trial, following Cutright's presentation of evidence, Metropolitan moved for a directed verdict regarding Cutright's contention that he was discharged in violation of state law. Metropolitan argued that W.Va.Code § 33–12A–1 *et seq.* violates the Supremacy Clause of the United States Constitution. Metropolitan also argued that the company is authorized to sell only life insurance and sickness and accident insurance in West Virginia, thus exempting it from the provisions of this statute. The court denied the motion for a directed verdict. At the end of the trial, Metropolitan renewed its motion for a directed verdict. The court once again denied the motion. The court also denied Cutright's motion for a directed verdict on damages.

The jury returned a verdict of $1,000,000 on Cutright's claim that he was discharged in violation of state law and $10,221.01 for accumulated vacation pay. The court entered a judgment order against Metropolitan on February 28, 1996. Metropolitan timely filed a motion for judgment notwithstanding the verdict, or, in the alternative, a new trial, reiterating all of its former arguments. The court denied this motion on April 22, 1996. It is from this order that Cutright and Metropolitan filed cross-appeals in this Court. These appeals have been consolidated on appeal for purposes of writing this opinion.

On appeal, Cutright assigns several errors. He contends the circuit court erred in granting summary judgment: (1) as to Count I of the complaint, because he articulated a cognizable public policy and there was a triable issue of fact as to whether the reasons for termination were pretextual; (2) as to Count IV, because Thomas and Schlegel interfered with his employment contract for personal gain and vendetta; (3) as to Count V, because the defendants interfered with his legitimate expectation that he would be gainfully employed in the insurance/securities industry and would market products to former clientele; (4) as to Count VI, because Schlegel defamed Cutright and the court improperly applied the doctrine of qualified immunity; (5) as to Count VII, because the agreements not to compete were geographically overbroad and lacking in consideration; (6) as to Count VIII, because Metropolitan did not require that its agents create and retain certain information.

On appeal, Metropolitan assigns three errors. First, Metropolitan contends a life insurance company cannot be liable for failing to comply with W.Va.Code § 33–12A–3 when the definition section of that article, W.Va. Code § 33–12A–2, exempts companies, such as Metropolitan, that sell only life or accident and sickness insurance. Next, Metropolitan contends the "good cause" termination provisions of W.Va.Code § 33–12A–3 violate the Supremacy Clause of the United States Constitution by conflicting with Title VII of the Civil Rights Act of 1964. Metropolitan argues Title VII pre-empts state law when state law permits an employment practice that is unlawful under Title VII. Metropolitan finally alleges that the damages award granted Cutright under W.Va.Code § 33–12A–3 wrongfully included future income. Metropolitan does not seek to disturb the jury award in Cutright's favor on Count III, vacation pay.

In Syllabus Point 2 of *Painter v. Peavy*, 192 W.Va. 189, 451 S.E.2d 755 (1994), this Court said, " ' "A motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the

law." Syllabus Point 3, *Aetna Casualty & Surety Co. v. Federal Insurance Co. of New York,* 148 W.Va. 160, 133 S.E.2d 770 (1963).' Syllabus Point 1, *Andrick v. Town of Buckhannon,* 187 W.Va. 706, 421 S.E.2d 247 (1992)." The Court further explained in Syllabus Point 3 of *Painter, id.,* that "[t]he circuit court's function at the summary judgment stage is not to weigh the evidence and determine the truth of the matter, but is to determine whether there is a genuine issue for trial."

After thoroughly reviewing the record and briefs that were submitted on appeal, we believe the circuit court did not err in granting summary judgment to Metropolitan on Counts I, IV, V, VI, VII, and VIII. We agree that Metropolitan "demonstrated a legitimate, non-pretextual and non-retaliatory reason for Plaintiff's discharge . . . including complaints of insubordinate behavior and inappropriate remarks." We also agree Cutright "failed to demonstrate even a *prima facie* case of tortious interference as those elements are set forth in *Torbett v. Wheeling Dollar Savings & Trust Co.,* 173 W.Va. 210, 314 S.E.2d 166 (1983),[3] with respect to [tortious interference with third party contract and prospective business relationships]." Similarly, we agree the record does not indicate Cutright had any personal knowledge that Schlegel made a defamatory remark. We agree the agreements not to compete entered into by Cutright are "reasonable by their terms and provisions," even if other employees negotiate better deals. Whether other employees do or do not have to execute such agreements is of no consequence to this case as this aspect "rises and falls with each individual case." Finally, we agree the policyholders' files, which were maintained by Cutright, were and continue to be the property of Metropolitan. The evidence indicates the files were generated in the course of employment and Cutright was compensated for maintaining the files. The judgment of

the Circuit Court of Harrison County is therefore affirmed on each of these issues.

However, for reasons we will discuss below, we believe the circuit court improperly granted summary judgment to Cutright on the issue of liability on Count II of the complaint, that is, termination in violation of state law. The court also erred when at the close of Cutright's presentation of evidence at trial, Metropolitan made a motion for a directed verdict which the court refused to grant. Metropolitan argued the state statute was superseded by Title VII under the Supremacy Clause of the United States Constitution.

W.Va.Code § 33–12A–3 (1984) states:

No insurance company may cancel, refuse to renew or otherwise terminate a written contractual relationship with any insurance agent who has been employed or appointed pursuant to that written contract by such insurance company for a period of more that five years, except for "good cause," as prescribed herein. If an insurance company proposes to cancel, fail to renew or otherwise terminate a contractual relationship with the agent, the company shall so notify the agent by certified mail at least ninety days prior to the date upon which the company proposed to cancel, fail to renew or terminate the contractual relationship. Such notice shall include a statement of the grounds upon which the insurance company bases its decision to cancel, refuse to renew or terminate any contractual relationship.

The following matters are "good cause" for an insurance company to terminate the contractual relationship with its agent:

(a) Criminal misconduct or gross negligence relating to the business or premises of the insurance agency;

(b) Fraud or moral turpitude;

(c) Abandonment or unattendance of the business or premises of the insurance

---

**3.** Syllabus Point 2 of *Torbett v. Wheeling Dollar Savings & Trust Company,* 173 W.Va. 210, 314 S.E.2d 166 (1983), states in part:

To establish prima facie proof of tortious interference, a plaintiff must show:

(1) existence of a contractual or business relationship or expectancy;

(2) an intentional act of interference by a party outside that relationship or expectancy;

(3) proof that the interference caused the harm sustained; and

(4) damages.

agency for such period of time as may unreasonably interfere with the transacting of business;

(d) The failure by the agent to pay moneys over to the company for insurance contracts sold by the agency;

(e) The death or disability of the agent; and

(f) Upon the company becoming insolvent or discontinuing any line of insurance for any business purpose: Provided, That the insurance commissioner shall notify or cause to be notified in writing all agents of such insolvent insurance company that they are no longer entitled to any benefit under their contract with the insolvent company.

W.Va.Code § 33–12A–2 (1984) defines "insurance company" as follows:

(a) "Insurance company" means any individual, firm, or corporation engaged in the business of selling insurance in this State, excepting only: ... (2) companies engaged exclusively in the sale of life or accident and sickness insurance.

The central and threshold issue which is finally dispositive of this case is whether this state legislation is pre-empted by federal law. We believe the "good cause" provisions of W.Va.Code § 33–12A–3 conflict with Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (1994). Under the Supremacy Clause [4] of the United States Constitution, state legislation that interferes with or is contrary to federal law is pre-empted by the federal law.[5]

■ "It is a familiar and well-established principle that the Supremacy Clause, U.S. Const., Art. VI, cl. 2, invalidates state laws that 'interfere with, or are contrary to,' federal law." *Hillsborough County, Florida v. Automated Medical Laboratories, Inc.,* 471

U.S. 707, 712, 105 S.Ct. 2371, 2375, 85 L.Ed.2d 714, 721 (1985) (quoting *Gibbons v. Ogden,* 9 Wheat. 1, 211, 6 L.Ed. 23 (1824)). In *Schneidewind v. ANR Pipeline Co.,* 485 U.S. 293, 299–300, 108 S.Ct. 1145, 1150–51, 99 L.Ed.2d 316, 325 (1988), the Supreme Court further explained by stating:

Congress explicitly may define the extent to which its enactments pre-empt state law. In the absence of explicit statutory language, however, Congress implicitly may indicate an intent to occupy a given field to the exclusion of state law. Such a purpose properly may be inferred where the pervasiveness of the federal regulation precludes supplementation by the States, where the federal interest in the field is sufficiently dominant, or where the object sought to be obtained by the federal law and the character of obligations imposed by it ... reveal the same purpose. Finally, even where Congress has not entirely displaced state regulation in a particular field, state law is pre-empted when it actually conflicts with federal law. Such a conflict will be found when it is impossible to comply with both state and federal law or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress[.] (Citations omitted).

Simply put, the narrow "good cause" termination provisions listed in W.Va.Code § 33–21A–3 permit unlawful conduct which is prohibited by Title VII. The state statute, therefore, protects employees who violate these federal laws. Title VII itself expressly pre-empts "any such law which purports to require or permit the doing of any act which would be an unlawful employment practice under this subchapter." 42 U.S.C. § 2000e–7 (1994).

4. Article VI, Clause 2 of the United States Constitution states:

This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

5. We find it is not necessary for us to decide and discuss Metropolitan's arguments (1) that the company is exempt from W.Va.Code § 33–12A–1 *et seq.* because Metropolitan sells only life and accident and health insurance in West Virginia, and (2) that the circuit court erred by finding as a matter of law Cutright had a written contract of employment, because we are reversing Metropolitan's liability to Cutright under the Supremacy Clause.

Title VII prohibits sexual harassment in the workplace.[6] The Supreme Court has interpreted this language to prohibit work environments that are discriminatorily hostile or abusive. In *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295, 301 (1993), the Supreme Court said:

> Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). As we made clear in *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), this language "is not limited to 'economic' or 'tangible' discrimination. The phrase 'terms, conditions, or privileges of employment' evinces a congressional intent 'to strike at the entire spectrum of disparate treatment of men and women' in employment," which includes requiring people to work in a discriminatorily hostile or abusive environment. *Id.* at 64, 106 S.Ct. at 2404, quoting *Los Angeles Dept. of Water and Power v. Manhart*, 435 U.S. 702, 707, n. 13, 98 S.Ct. 1370, 1375, n. 13, 55 L.E.2d 657 (1978) (some internal quotation marks omitted). When the workplace is permeated with "discriminatory intimidation, ridicule, and insult," 477 U.S. at 65, 106 S.Ct. at 2405, that is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment," *id.* at 67, 106 S.Ct. at 2405 (internal brackets and quotation marks omitted), Title VII is violated.

The Supreme Court discusses a discriminatorily hostile or abusive work environment by stating:

> A discriminatorily abusive work environment, even one that does not seriously affect employees' psychological well-being, can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers. Moreover, even without regard to these tangible effects, the very fact that the discriminatory conduct was so severe or pervasive that it created a work environment abusive to employees because of their race, gender, religion, or national origin offends Title VII's broad rule of workplace equality....

*Harris*, 510 U.S. at 22, 114 S.Ct. at 370–71, 126 L.Ed.2d at 302.

In this case, Cutright's conduct resulted in a situation where the workplace was permeated with discriminatory intimidation, ridicule of the three female clerical employees and insult which was so severe and pervasive that it created a hostile and abusive working environment, in clear and actionable violation of Title VII of the federal statute. Oddly enough, he could not be discharged under W.Va.Code § 33–12A–3, because his egregious misconduct does not fit one of the six listed grounds for discharge.

We find guidance in the federal Equal Employment Opportunity Commission's guidelines on sexual harassment. These guidelines state clearly that "[w]ith respect to conduct between fellow employees, an employer is responsible for acts of sexual harassment in the workplace where the employer (or its agents or supervisory employees) knows or should have known of the conduct, unless it can show that it took immediate and appropriate corrective action." 29 C.F.R. § 1604.11(d) (1996). The guidelines emphasize the importance of an employer's preventive acts:

> (f) Prevention is the best tool for the elimination of sexual harassment. An employer should take all steps necessary to prevent sexual harassment from occurring, such as affirmatively raising the subject, expressing strong disapproval, developing appropriate sanctions, informing employ-

---

**6.** 42 U.S.C. § 2000e–2(a)(1) (1994) states:
It shall be an unlawful employment practice for an employer—
(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin[.]

ees of their right to raise and how to raise the issue of harassment under title VII, and developing methods to sensitize all concerned.

29 C.F.R. 1604.11(f) (1996).

Within this Congressional framework, an employer must have the ability to discipline employees who are creating a discriminatorily hostile work environment, through termination and the credible threat of termination. Depriving an employer of these potential sanctions severely and illegally handicaps employers' efforts to prevent, or respond to, conduct that creates an unlawful hostile work environment. In fact, the "good cause" termination provisions found in W.Va.Code § 33–12A–3 unlawfully deprive insurance companies of these very sanctions.

If we adopted the position Cutright urges upon us, we would be putting insurance companies in an untenable state. These companies could not possibly comply with both state and federal law. Either way they would have to pay. This results in an absolutely impossible legal situation. If a company fires someone for a reason not on the state statute's list, the company has to pay money damages. Conversely, if a company has good reason under Title VII to, but fails to, fire someone because the reason is not listed in the state statute, the company still has to pay.

■ We note here that an insurance company can certainly continue to terminate the employment of an agent for any one of the six reasons enumerated in W.Va.Code § 33–12A–3. However, insofar as any provision of W.Va.Code § 33–12A–1 *et seq.* conflicts with Title VII of the Civil Rights Act, Title VII necessarily controls pursuant to the requirements of the Supremacy Clause of the United States Constitution, and, therefore, an insurance company may terminate the employment of an agent for creating a discriminatorily hostile or abusive work environment. Obviously, when an agent is fired under Title VII, the company does not have to comply with the ninety-day notice provided in W.Va. Code § 33–12A–3.

Therefore, the decision of the Circuit Court of Harrison County granting summary judgment is affirmed, except insofar as it allowed the issue of liability for termination of employment in violation of state law to go to the jury. The order is reversed on such point and the $1,000,000 portion of the verdict entered in Cutright's favor is set aside and this Court declares that any claim on such basis is barred by the Supremacy Clause of the United States Constitution.

Affirmed in part and reversed in part.