640 S.E.2d 81

**Jerrill DAVIS and Virginia
Davis, et al., Plaintiffs**

v.

**EAGLE COAL AND DOCK COMPANY,
et al., Defendants.**

No. 33054.

Supreme Court of Appeals of
West Virginia.

Submitted: Oct. 25, 2006.

Decided: Dec. 4, 2006.

Guy R. Bucci, Esq., Timothy C. Bailey, Esq., Dan R. Snuffer, Esq., Bucci, Bailey & Javins, Gregory A. Lofstead, Esq., Richardson, Patrick, Westbrook & Brickman, Charleston, SC, for Plaintiffs.

Michael J. Farrell, Esq., Tamela J. White, Esq., Farrell, Farrell & Farrell, Huntington, for Defendant.

MAYNARD, Justice.

In this case, this Court answers two certified questions from the Circuit Court of Mingo County which we reformulate [1] as follows:

1. Are state law negligence, product liability, and breach of warranty claims against manufacturers of roof bolter dust collection systems preempted by the Federal Mine Safety and Health Act, 30 U.S.C. §§ 801, *et seq.*?

2. Are state law failure to warn claims against manufacturers of roof bolter dust collection systems preempted by the Federal Safety and Health Act, 30 U.S.C. §§ 801, *et seq.*? [2]

For the reasons that follow, we find that state law claims are not preempted by the Mine Safety and Health Act.

## I.

### FACTS

The plaintiffs in several cases below were employed in various coal mining operations

---

**1.** *See* Syllabus Point 3 of *Kincaid v. Mangum,* 189 W.Va. 404, 432 S.E.2d 74 (1993) (recognizing this Court's power to reformulate certified questions).

**2.** The circuit court certified the following two questions:

1. Whether a determination of liability predicated on a roof bolter dust collection system design that has not been heretofore deemed permissible by MSHA/Secretary of Labor or which has not been heretofore otherwise approved by MSHA/Secretary of Labor is subject to preemption by virtue of the conflict between such a judicial determination and 30 U.S.C.A § 844 and/or the occupation of the field of roof

bolter dust collection system design by Federal regulatory authorities.
The circuit court answered this question in the affirmative.

2. Whether a determination of liability predicated on a failure to warn relating to a roof bolter's dust collection system via a warning not specifically prescribed by MSHA/Secretary of Labor is subject to preemption by virtue of the conflict between such a judicial determination and 30 U.S.C.A § 811 and/or occupation of the field of roof bolter dust collection system and dust control warnings by Federal regulatory authorities.
The circuit court also answered this question in the affirmative.

and now suffer from silicosis. There are several defendants below but the only one pertinent to these certified questions is J.H. Fletcher & Co., a manufacturer of roof bolters.

A roof bolter is a piece of heavy machinery that drills holes in the top of the coal mine shaft and then inserts bolts to prevent the roof of the mine shaft from collapsing on underground coal miners. These roof bolting machines are equipped with what is known as an integral dry dust suppression system (hereinafter "dust collector," "dust collection unit" or "dust collection system") the purpose of which is to collect silica released by the roof bolter's drilling and contain the dust in a filtration system to prevent coal miners from inhaling the dust.[3]

These dust collectors are heavily regulated by the federal Mine Safety and Health Administration (hereinafter "MSHA") under the federal Mine Safety and Health Act (hereinafter "the Act") and its accompanying regulations which are detailed and comprehensive. Only dust collectors that meet all of the federal standards are certified as "permissible" for use in coal mines.[4] In order to obtain certification of a dust collector, a manufacturer must furnish a complete unit or system to the federal government for inspection and testing.[5] The government does not "test or investigate any dust collector that in its opinion is not constructed of suitable materials, that evidences faulty workmanship, or that is not designed upon sound engineering principles."[6] Finally, all end-product dust collector designs submitted are tested by the government to ensure that they meet a specific performance standard. This standard is based, in part, on whether the dust collector prevents the dissemination of harmful amounts of dust into the air.[7]

Upon completing its testing of individual dust collectors, MSHA issues either a certificate of approval or a notice of disapproval.[8] A government-approved label is then placed on the certified unit, the content and location of which are controlled by federal regulations.[9] Finally, a party cannot unilaterally

---

3. 30 C.F.R. § 33.2(e) defines "Dust-collector unit" as "a complete assembly of parts comprising apparatus for collecting the dust that results from drilling in rock in coal mines, and is independent of the drilling equipment." According to 30 C.F.R. § 33.2(g), "dust-collecting system means an assembly of parts comprising apparatus for collecting the dust that results from drilling in rock and is dependent upon attachment to other equipment for its operation."

4. The regulations governing dust collection systems are found in 30 C.F.R. §§ 33.1—33.38. According to § 33.1, in part, "[t]he regulations in this part set forth the requirements for dust collectors used in connection with rock drilling in coal mines to procure their certification as permissible for use in coal mines." "Permissible" means that the dust collector "conforms to the requirements of [Part 33], and that a certificate of approval to that effect has been issued." 30 C.F.R. § 33.2(a).

5. 30 C.F.R. § 33.6(g).

6. 30 C.F.R. § 33.20(a).

7. According to 30 C.F.R. § 33.20(b),
   Adequacy of design and construction of a unit or system will be determined in accordance with its ability (1) to prevent the dissemination of objectionable or harmful concentrations of dust into a mine atmosphere, and (2) to protect against explosion and/or fire hazards

of electrical equipment, except as provided in § 33.38(b).
   Concerning what constitutes objectionable or harmful concentrations of dust, 30 C.F.R. § 33.33(b) provides that "[u]nder each prescribed test condition, the net concentration of airborne dust at each drill operator's position shall not exceed 10 million particles (5 microns or less in diameter) per cubic foot of air[.]"

8. 30 C.F.R. § 33.10.

9. 30 U.S.C. § 811(a)(7) provides that,
   Any mandatory health or safety standard promulgated under this subsection shall prescribe the use of labels or other appropriate forms of warning as are necessary to insure that miners are apprised of all hazards to which they are exposed, relevant symptoms and appropriate emergency treatment, and proper conditions and precautions of safe use or exposure.
   According to 30 C.F.R. § 33.9, in part:
   Certified dust-collecting systems shall bear labels or tags which shall contain the following: "Performance-tested Dust Collecting, System, MSHA File No. P/T _____," and name of manufacturer, identifying numbers of the dust-collector parts, and description of the limitations for which performance is certified. MSHA will assign a P/T file number in the certification letter.
   Further, 30 C.F.R. § 33.11 indicates that,
   (a) A certificate of approval will be accompanied by a photograph of a design for an ap-

change any design, material, specification or use instruction of a certified dust collector unit or system without MSHA's prior approval.[10]

The plaintiffs allege in their actions against the defendant that the dust collection systems failed to protect the roof bolter operators from silica dust released during the machines' operations, and that any warnings pertaining to silica dust as a result of operating the machines were inadequate. The defendant subsequently moved, pursuant to West Virginia Rule of Civil Procedure 12(b)(6), for dismissal of the plaintiffs' actions based, among other things, on the defendant's claim that any state law is preempted by federal law.[11]

By order dated June 17, 2005, the circuit court certified the issue of federal preemption to this Court.[12] As noted above, the circuit court found that federal law preempts the plaintiffs' claims.[13]

---

proval plate, bearing the emblem of the Mine Safety and Health Administration, the name of the applicant, the name of the unit, the approval number or space for the approval number (or numbers of permissibility if electrical parts is involved), spaces for the type and the serial numbers of the unit, conditions of approval, and identifying numbers of the dust collector parts. When deemed necessary by MSHA, an appropriate statement shall be added, giving the precautions to be observed in maintaining the unit in an approved condition.

(b) An approval plate for a unit designed for use in a nongassy coal mine shall state that any electrical parts are not certified for use in a gassy coal mine. (See § 33.38(c).)

(c) The applicant shall reproduce the design either as a separate plate or by stamping or molding it in some suitable place on each unit to which it relates. The size, type, and method of attaching and location of an approval plate are subject to the approval of MSHA. The method of affixing the plate shall not impair the dust-collection or explosion-proof features of the unit.

(d) The approval plate identifies the unit, to which it is attached, as permissible, and is the applicant's guarantee that the unit complies with the requirements of this part. Without an approval plate, no unit has the status of 'permissible' under the provisions of this part.

(e) Use of the approval plate obligates the applicant to whom the certification of approval was granted to maintain the quality of each unit bearing it and guarantees that it is manufactured and assembled according to the drawings and specifications upon which a certificate of approval was based. Use of the approval plate is not authorized except on units that conform strictly with the drawings and specifications upon which the certificate of approval was based.

**10.** 30 C.F.R. § 33.12 provides:

If an applicant desires to change any feature of a certified unit or system, he shall first obtain MSHA's approval of the change, pursuant to the following procedure:

(a)(1) Application shall be made as for an original certificate, requesting that the existing certification be extended to cover the proposed changes, and shall be accompanied by drawings, specifications, and related data showing the changes in detail....

(b) The application will be examined by MSHA to determine whether inspection and testing will be required. Testing will be necessary if there is a possibility that the modification may affect adversely the performance of the unit or system. MSHA will inform the applicant whether such testing is required and the components or materials to be submitted for that purpose.

(c) If the proposed modification meets the requirements of this part and Part 18 of Subchapter D of this chapter if applicable, a formal extension of certification will be issued, accompanied by a list of new and corrected drawings and specifications to be added to those already on file as the basis for the extension of certification.

**11.** We have previously recognized that, pursuant to W.Va.Code § 58–5–2 (1998), a question of law arising from a challenge of the sufficiency of a pleading may be certified to this Court. Further, the purpose of a motion to dismiss under Rule 12(b)(6) is to test the formal sufficiency of the complaint. Therefore, a question of law arising from a Rule 12(b)(6) motion is appropriate for certification. *See Zelenka v. City of Weirton*, 208 W.Va. 243, 539 S.E.2d 750 (2000).

**12.** Concerning the circuit court's and this Court's authority to determine the existence of federal preemption in this case, we have held that, "West Virginia state courts have subject matter jurisdiction over federal preemption defenses." Syllabus Point 3, *State ex rel. Orlofske v. City of Wheeling*, 212 W.Va. 538, 575 S.E.2d 148 (2002).

**13.** In answering the certified questions, the circuit court reasoned, in part, as follows:

Before a dust collector ... system can be used in an underground coal mine, MSHA must approve it as "permissible." The Agency has promulgated comprehensive regulations in the Code of Federal Regulations regarding the control of dust caused by roof drilling, the

## II.

## STANDARD OF REVIEW

■ It is well settled that this Court's review of a circuit court's answer to a certified question is *de novo*. *See* Syllabus Point 1, *Gallapoo v. Wal–Mart Stores, Inc.*, 197 W.Va. 172, 475 S.E.2d 172 (1996) (holding that "[t]he appellate standard of review of questions of law answered and certified by a circuit court is *de novo* ").

## III.

## DISCUSSION

■ The authority of federal law to preempt state law is found in the United States Constitution in what is known as the Supremacy Clause which provides:

This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

U.S. Const. art. VI, cl. 2. This Court has held that "[t]he Supremacy Clause of the United States Constitution, Article VI, Clause 2, invalidates state laws that interfere with or are contrary to federal law." Syllabus Point 1, *Cutright v. Metropolitan Life Ins. Co.*, 201 W.Va. 50, 491 S.E.2d 308 (1997).

■ It is also true, however, that "[o]ur law has a general bias against preemption." *General Motors Corp. v. Smith*, 216 W.Va. 78, 83, 602 S.E.2d 521, 526 (2004). "[B]oth this Court and the U.S. Supreme Court have explained that federal preemption of state court authority is generally the exception, and not the rule." *In re: West Virginia Asbestos Litigation*, 215 W.Va. 39, 42, 592 S.E.2d 818, 821 (2003). "Given the importance of federalism in our constitutional structure ... we entertain a strong presumption that federal statutes do not preempt state laws; particularly those laws directed at subjects—like health and safety—'traditionally governed' by the states." *Law v. General Motors Corp.*, 114 F.3d 908, 909–910 (9th Cir.1997), *quoting CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664, 113 S.Ct. 1732, 1737, 123 L.Ed.2d 387 (1993). Therefore, "preemption is disfavored in the absence of convincing evidence warranting its

design of permissible dust collectors, warnings associated with the dust hazard in an underground coal mine or any other aspect of this "field of regulation." 30 C.F.R. § 33.1 to 33.38.

Even though the Court finds that Congress has legislated comprehensively to occupy the entire field of regulation relating to the design of dust collecting systems and warnings, the Court recognizes that the state has the right to supplement federal law. However, West Virginia has not added to or otherwise supplemented these regulations; plaintiffs do not point to any applicable state statute or regulation applicable to their claims against Fletcher.

Because all of the claims asserted by plaintiffs against Fletcher—product design and failure to warn—are predicated upon a theory that the dust collecting system incorporated into the Fletcher roof bolting machine was defective, these cases qualify for application of the second prong of the doctrine of implied preemption. Congress expressly reserved unto itself the form and substance of "labels or other appropriate forms or warnings as are necessary to insure that miners are apprised of all hazards to which they are exposed" with respect to the exposure to hazardous dust in an underground coal mine. 30 U.S.C. § 811.

Further, because plaintiffs allege use issues such as clogged drill steels, hoses and filters, the Court also relies upon and concludes that 30 C.F.R. § 33.11(a) applies to the duty to warn issue when it provided: "When deemed necessary by MSHA, an appropriate statement shall be added, giving precautions to be observed in maintaining the unit in an approved condition." The Court observes that this same regulation requires: "[a] certificate of approval will be accompanied by a photograph of a design for an approval plate, bearing the emblem of the Mine Safety and Health Administration, the name of the applicant, the name of the unit, the approval number or space for the approval number (or numbers if permissibility of electrical parts is involved) spaces for the type and the serial numbers of the unit, conditions of approval and identifying numbers of the dust collector parts." 30 C.F.R. § 33.11(a).

A state law, derived from a verdict in one or more of these cases, would conflict with federal law regarding the design of the dust collecting system and warnings because it would be impossible to comply with both and because state law stands as an obstacle to the accomplishment and execution of congressional objectives. (Citations omitted).

application." *Hartley Marine Corp. v. Mierke,* 196 W.Va. 669, 673, 474 S.E.2d 599, 603 (1996). Said another way, "pre-emption will not lie unless it is 'the clear and manifest purpose of Congress.' " *Law,* 114 F.3d at 910, *quoting Easterwood, id.* For these reasons, "[c]onsideration under the Supremacy Clause starts with the basic assumption that Congress did not intend to displace state law." *State ex rel. Orlofske v. City of Wheeling,* 212 W.Va. 538, 543, 575 S.E.2d 148, 153 (2002), *quoting Maryland v. Louisiana,* 451 U.S. 725, 746, 101 S.Ct. 2114, 2129, 68 L.Ed.2d 576, 595 (1981).

■ This Court has previously recognized that "[i]n any preemption analysis, the focus of the inquiry is on congressional intent." *Hartley Marine Corp.,* 196 W.Va. at 674, 474 S.E.2d at 604 (citations omitted). We have also explained that "[p]reemption may either be explicit, *i.e.,* set forth in the federal statute, or implied." *In re: West Virginia Asbestos Litigation,* 215 W.Va. at 43, 592 S.E.2d at 822. Implied preemption may take two forms.

[I]n the absence of explicit statutory language signaling an intent to pre-empt, we infer such intent where Congress has legislated comprehensively to occupy an entire field of regulation, leaving no room for the states to supplement federal law, or where the state law at issue conflicts with federal law, either because it is impossible to comply with both or because the state law stands as an obstacle to the accomplishment and execution of congressional objectives[.]

*Hartley Marine Corp.,* 196 W.Va. at 674, 474 S.E.2d at 604, *quoting Northwest Cent. Pipeline Corp. v. Kansas Corp. Comm'n,* 489 U.S. 493, 509, 109 S.Ct. 1262, 1273, 103 L.Ed.2d 509 (1989).

■ The defendant argues first that field preemption exists in the instant case. Specifically, the defendant opines in its brief to this Court that,

compliance with 30 U.S.C.A. § 844 [14] and [30 C.F.R. §§ 33.1—33.38] constitutes field preemption. Federal authority completely occupies the field of law with respect to roof bolters and respirable dust exposures by the foregoing and by the fact that manufacturers are prohibited from making *any* design, instruction, labeling, component part or any other change without first having MSHA's approval. 30 C.F.R. § 33.12.[15] ... Because Congress and MSHA has [sic] completely occupied the field of regulation as to this product, any State damages action would directly conflict with the same. This conflict is expressly prohibited. [30 U.S.C.A. § 955] (footnotes added).

We disagree with the defendant and find that field preemption does not exist in this case. As stated above, preemption is only to be inferred "[i]n the absence of explicit statutory language signaling an intent to preempt." *Hartley Marine Corp.,* 196 W.Va. at 674, 474 S.E.2d at 604. In the instant case, however, there is explicit statutory language signaling Congress's intent to preempt state law insofar as it conflicts with federal law. This explicit statutory language is found in 30 U.S.C. § 955 which states:

(a) No State law in effect on December 30, 1969 or which may become effective thereafter shall be superseded by any provision of this chapter or order issued or any mandatory health or safety standard, except insofar as such State law is in conflict with this chapter or with any order issued or any mandatory health or safety standard.

14. According to 30 U.S.C. § 844,

The dust resulting from drilling in rock shall be controlled by the use of permissible dust collectors, or by water or water with a wetting agent, or by ventilation, or by any other method or device approved by the Secretary which is at least as effective in controlling such dust. Respiratory equipment approved by the Secretary and the Secretary of Health and Human Services shall be provided persons exposed for short periods to inhalation hazards from gas, dusts, fumes, or mist. When the exposure is for prolonged periods, other measures to protect such persons or to reduce the hazard shall be taken.

15. According to 30 C.F.R. § 33.12, in part, "[i]f an applicant desires to change any feature of a certified unit or system, he shall first obtain MSHA's approval of the change[.]"

(b) The provisions of any State law or regulation in effect upon the operative date of this chapter, or which may become effective thereafter, which provide for more stringent health and safety standards applicable to coal or other mines than do the provisions of this chapter or any order issued or any mandatory health or safety standard shall not thereby be construed or held to be in conflict with this chapter. The provisions of any State law or regulation in effect December 30, 1969, or which may become effective thereafter, which provide for health and safety standards applicable to coal or other mines for which no provision is contained in this chapter or in any order issued or any mandatory health or safety standard, shall not be held to be in conflict with this chapter.

Therefore, because Congress has clearly expressed its intent not to preempt all state law or to occupy the entire field, we conclude that field preemption does not exist in this case.

Second, the defendant asserts that express preemption exists which is indicated by Congress's promulgation of regulations that specify the design, engineering, construction, and performance criteria for dust collectors. Essentially, the defendant's argument hinges on the fact that the federal regulations are detailed, comprehensive, and mandatory. According to the defendant, a fair reading of this comprehensive regulatory scheme leads to the inescapable conclusion that Congress clearly intended to preempt state laws pertaining to dust collectors.

■ We find no merit to the defendant's argument. Again, because Congress included an express preemption provision in the Mine Safety and Health Act, this Court does not find it necessary to infer Congressional intent from regulations that do not specifically address preemption. According to the clear provisions of § 955(a), only state laws that are in conflict with the federal standards for permissible dust collectors are supersed-

ed by the federal standards. Further, pursuant to the plain language of § 955(b), state laws or regulations that provide for more stringent health and safety standards than do the federal provisions shall not be construed to be in conflict with those provisions. It is obvious to this Court from the clear language in § 955(a) and (b) that Congress did not intend to preempt State laws that provide for more stringent health and safety standards than the federal laws. Therefore, we find that Congress did not intend to preempt state law claims that may hold the defendant's dust collection system to a more stringent standard than federal law.

■ The defendant contends, however, that paragraph (b) of § 955 is not applicable to its dust collection system. The defendant points out that § 955(b) applies specifically to health and safety standards "applicable to coal or other mines," which, says the defendant, refers to the property from which coal is mined and not to manufacturers of dust collectors. We decline to read the language of § 955(b) so narrowly. According to 30 U.S.C. § 802(h)(1), "coal or other mine" means, among other things, "equipment" and "machines" "used in, or to be used in . . . the work of extracting . . . minerals." A roof bolter with a dust collection system is a piece of equipment or machinery used in the work of mining underground coal. Specifically, it makes the underground mining of coal possible by preventing roof collapses. It also makes the job of mining underground coal safer by limiting the amount of respirable dust in the air resulting from roof bolting operations.[16] But even absent the definition of the language "coal or other mine" in 30 U.S.C. § 802(h)(1), it is apparent to this Court that any common sense construction of the phrase "applicable to coal or other mines" includes machinery, such as a roof bolter, which is integral to underground mining operations. Thus, we find no reason, in the absence of express language to the contrary, to exclude roof bolters from the application § 955(b).

**16.** It is also the contention of the defendant that absent the distinction between § 955(a) and § 955(b), there would have been no reason for Congress to have enacted both subsections (a) and (b). We disagree. We believe instead that

when the subsections are read *in pari materia*, subsection (a) sets forth the general rule that state laws not in conflict with federal law are not superseded, and subsection (b) defines what constitutes "conflict" under subsection (a).

The defendant further avers that state law pertaining to dust collectors is preempted under the principles of conflict preemption. Specifically, according to the defendant, the distinction between 30 U.S.C. § 955(a) and (b) "spells out the clear and firm expression of Congressional intent to preserve conflict preemption principles for a narrow category of persons and entities involved in the mining industry, other than coal or other mines." The defendant apparently defines the term "conflict" for the purposes of conflict preemption to mean "different." In other words, according to the defendant, any state law or jury verdict requiring a *different* standard than that set forth in federal law is preempted. The defendant supports this proposition by citing specific language in both the Act and its accompanying federal regulations. For example, the defendant cites 30 U.S.C. § 811(a)(6)(A) which provides:

> The Secretary, in promulgating mandatory standards dealing with toxic materials or harmful physical agents under this subsection, shall set standards which most adequately assure on the basis of the best available evidence that no miner will suffer material impairment of health or functional capacity even if such miner has regular exposure to the hazards dealt with by such standard for the period of his working life. Development of mandatory standards under this subsection shall be based upon research, demonstrations, experiments, and such other information as may be appropriate. In addition to the attainment of the highest degree of health and safety protection for the miner, other considerations shall be the latest available scientific data in the field, the feasibility of the standards, and experience gained under this and other health and safety laws. Whenever practicable, the mandatory health or safety standard promulgated shall be expressed in terms of objective criteria and of the performance desired.

It is the defendant's position that the use of the term "mandatory" in this code section indicates that any state law or jury verdict that deviates from the federal standards is preempted. We reject the defendant's reasoning.

This Court has explained that "conflict preemption[ ] [occurs] where 'compliance with both federal and state regulations is a physical impossibility,' or where state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress[.]" *Hartley Marine Corp.*, 196 W.Va. at 674, 474 S.E.2d at 604, *citing Gade v. National Solid Wastes Management Ass'n*, 505 U.S. 88, 98, 112 S.Ct. 2374, 2383, 120 L.Ed.2d 73 (1992). We do not believe that the defendant's compliance with both a jury verdict that requires more stringent standards than federal law and its compliance with less stringent federal standards is a physical impossibility. Logically, compliance with a more stringent state standard also indicates compliance with a less stringent federal standard.

Further, we do not believe that a jury verdict requiring a different standard than that set forth in the federal regulations would frustrate the objectives and execution of the federal standard. The purposes of the Mine Safety and Health Act are spelled out in 30 U.S.C. § 801(g), which provides,

> it is the purpose of this chapter (1) to establish interim mandatory health and safety standards and to direct the Secretary of Health and Human Services and the Secretary of Labor to develop and promulgate improved mandatory health or safety standards to protect the health and safety of the Nation's coal or other miners; (2) to require that each operator of a coal or other mine and every miner in such mine comply with such standards; (3) to cooperate with, and provide assistance to, the States in the development and enforcement of effective State coal or other mine health and safety programs; and (4) to improve and expand, in cooperation with the States and the coal or other mining industry, research and development and training programs aimed at preventing coal or other mine accidents and occupationally caused diseases in the industry.

This Court fails to see how state enforcement of a more stringent standard pertaining to dust collectors would frustrate these purposes. Essentially, "the purpose of the Fed-

eral Coal Mine Health and Safety Act is to protect the safety of the miner." *Westmoreland Coal Co. v. Federal Mine, Etc.,* 606 F.2d 417, 419—420 (4th Cir.1979), *see also Estate of Bernaldes v. U.S.,* 877 F.Supp. 301, 308 (W.D.Va.1995), *affirmed,* 81 F.3d 428 (4th Cir.1996) (recognizing that "protecting the health and safety of the nation's coal miners is one of the purposes of the Act"). Quite frankly, it seems to us that enforcement of a more stringent standard governing dust collectors would have the effect of better protecting the health and safety of miners by further limiting the amount of respirable silica that they breathe while operating roof bolters. Accordingly, we conclude that conflict preemption does not operate to prevent state law claims against the defendant.

Next, the defendant posits that this Court's decision in *In re: West Virginia Asbestos Litigation,* in which we found that state tort law claims against manufacturers of parts or components of railroad locomotives are preempted by the federal Locomotive Boiler Inspection Act, § 20701, *et seq.* supports a finding of preemption in the instant case. According to the defendant, the inspection, testing, approval, and performance regulations for dust collectors are more precise, detailed, and onerous than the regulations in the railroad preemption cases.

This Court does not believe that *In re: West Virginia Asbestos Litigation* is analogous to the present case. First, as seen above, the Mining Safety and Health Act has an express preemption provision that expressly preserves state laws that do not conflict with federal law. In contrast, the Locomotive Inspection Act is silent on preemption.[17] Moreover, an important practical basis for finding implied preemption in railroad cases is the unique interstate nature of the railroad business.

> This broad preemptive sweep is necessary to maintain uniformity of railroad operating standards across state lines. Locomotives are designed to travel long distances, with most railroad routes wending through interstate commerce. The virtue of uniform national regulation "is self-evident: locomotive companies need only concern themselves with one set of equipment regulations and need not be prepared to remove or add equipment as they travel from state to state." *Southern Pac. Transp. Co. v. Oregon PUC,* 9 F.3d 807, 811 (9th Cir.1993); *see also R.J. Corman R.R. v. Palmore,* 999 F.2d 149, 152 (6th Cir.1993) ("Th[e] lasting history of pervasive and uniquely-tailored congressional action indicates Congress's general intent that railroads should be regulated primarily on a national level through an integrated network of federal law."). . . .
>
> . . . the purpose of tort liability is to induce defendants to conform their conduct to a standard of care established by the state. *See San Diego Bldg. Trades Council v. Garmon,* 359 U.S. 236, 247, 79 S.Ct. 773, 780–81, 3 L.Ed.2d 775 (1959) ("The obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy."). . . . If each state were to adopt different liability-triggering standards, manufacturers would have to sell locomotives and cars whose equipment could be changed as they crossed state lines, or adhere to the standard set by the most stringent state.

*Law,* 114 F.3d 908, 910–11. These same considerations do not apply to the dust collectors at issue.

The defendant further argues that its faithful compliance with all of the federal standards that regulate dust collectors should shield it from claims that its dust collectors are defective. While this Court

---

**17.** In its brief, the defendant, in its discussion of *In re: West Virginia Asbestos Litigation,* points out that the preemption clause in the Federal Railroad Safety Act, 49 U.S.C. §§ 20101, *et seq.,* like the preemption clause in the Mine Safety and Health Act, expressly recognizes conflict preemption. Significantly, however, *In re: West Virginia Asbestos Litigation* concerned preemption under the Locomotive Inspection Act and not the Railroad Safety Act. Courts have found that "Congress did not intend the preemption provision of the Railroad Safety Act to modify the total-preemptive effect of the Locomotive Inspection Act." *Consol. Rail Corp. v. Pennsylvania Pub. Util.,* 536 F.Supp. 653, 657 (E.D.Pa.1982), *affirmed,* 696 F.2d 981 (3rd Cir.1982), *affirmed,* 461 U.S. 912, 103 S.Ct. 1888, 77 L.Ed.2d 280 (1983).

agrees that compliance with federal standards is compelling evidence on the defendant's behalf in any state law claim,[18] such claims are not completely foreclosed. As set forth above, Congress has clearly expressed its intent that states may adopt more stringent standards than those found in the Mining Safety and Health Act. This Court must give effect to Congressional intent. Moreover, we are confident that our decision herein supports the compelling public policy of encouraging manufacturers of dust collection units to continually strive to make those units safer than what is currently required by the federal Act.

Finally, the defendant opines that state law cannot require a more demanding standard governing dust collectors because federal regulations represent "the gold standard." We believe that to accept the defendant's argument is to deny the possibility of technological progress in the manufacture of dust collectors. Technology that represented the gold standard a short time ago may no longer represent the gold standard today. The federal regulations themselves recognize that "all possible designs, arrangements, or combinations of components and materials [of dust collectors] cannot be foreseen." 30 C.F.R. § 33.20. We believe that by permitting states to adopt more stringent dust collector standards than those found in the federal regulations, Congress has implicitly recognized that dust collector systems may be manufactured that actually exceed federal safety regulations.[19]

In sum, after reviewing the language of the Mine Safety and Health Act and its accompanying regulations, we conclude that our basic presumption that Congress did not intend to displace state law has not been rebutted by convincing evidence to the contrary. Quite simply, we do not believe that Congress's purpose to preempt all state law regulating dust collectors is clear and manifest. Accordingly, we hold that state tort law, product liability, breach of warranty, and failure to warn claims against manufacturers of roof bolter dust collection systems are not preempted by the Federal Mine Safety and Health Act, 30 U.S.C. § 801, *et seq.*[20]

## IV.

## CONCLUSION

For the reasons stated above, we answer the reformulated certified questions as follows:

1.  Are state law negligence, product liability, and breach of warranty claims against manufacturers of roof bolter dust collection systems preempted by the Federal Mine Safety and Health Act, 30 U.S.C. §§ 801, *et seq.*?

Answer: No.

2.  Are state law failure to warn claims against manufacturers of roof bolter dust collection systems preempted by the Federal Mine Safety and Health Act, 30 U.S.C. §§ 801, *et seq.*?

Answer: No.

Certified questions answered.

---

**18.** *See* footnote 20, *infra.*

**19.** The defendant also supports it argument in favor of preemption by asserting that no state, including West Virginia, has ever adopted a law or regulation regarding the performance, testing, approval, or certification of dust collectors. In light of our reading of the Mine Safety and Health Act to indicate that states may adopt laws or regulations that are more stringent than the federal Act, we do not find the fact that states have not adopted more stringent regulations to be legally significant.

**20.** This Court wishes to emphasize that our sole task in this case is to decide the narrow legal issue of federal preemption and not to determine whether the plaintiffs can actually maintain an action against the defendant. At this point in the litigation below, evidence has not yet been adduced and we essentially have only the bare allegations of the parties. We note, however, that if the defendant is able to show that it complied with all applicable federal regulations in the manufacture of its dust collector units, this showing may be a compelling defense to the claims of the plaintiffs.